NORTH HAVEN HOLDINGS LIMITED PARTNERSHIP
*v.* PLANNING AND ZONING COMMISSION OF
THE TOWN OF NORTH HAVEN ET AL.
(AC 33132)

Gruendel, Keller and Mihalakos, Js.

Argued May 28—officially released October 8, 2013

*John R. Lambert,* for the appellant (defendant North Haven Commons Development, L.P.).

*Bernard Pellegrino,* for the appellee (plaintiff).

*Opinion*

GRUENDEL, J. This case involves a dispute between neighboring commercial property owners. The defendant North Haven Commons Development Limited Partnership appeals from the judgment of the Superior Court sustaining the appeals of the plaintiff, North Haven Holdings Limited Partnership, from the decisions of the Planning and Zoning Commission of the Town of North Haven (commission) granting a special permit to the defendant pursuant to Article IX, § 9.1.3.7.1, of the North Haven Zoning Regulations (regulations) and approving the defendant's revised site plan.[1] The defendant contends that the court improperly concluded that

---

[1] Although the commission also was named as a defendant in the underlying proceeding, it has neither appealed from the decision of the Superior Court nor filed an appellate brief with this court. For purposes of clarity, we refer in this opinion to North Haven Commons Development Limited Partnership as the defendant.

the record does not substantiate the commission's decision to grant the special permit. We agree and, accordingly, reverse the judgment of the Superior Court.[2]

At all relevant times, the defendant owned a parcel of land known as 240 Universal Drive North in North Haven (town) that abuts the plaintiff's property located at 100 Universal Drive North. The two parcels were separated by an access road located on the defendant's property, over which the plaintiff had an access easement. The plaintiff's property contains a shopping center anchored by a Target store. At the time that the plaintiff's property was developed, all parties anticipated that the access road at some point would become a public road. As a result, the plaintiff "built to town road standards" in developing its commercial property at the request of the commission.

In 2007, the defendant submitted a site plan to develop a 200,000 square foot shopping center on its property.[3] On August 6, 2007, Douglas Gray made a presentation before the commission on behalf of the defendant.[4] As the minutes of that meeting reflect, Gray

[2] In hearing appeals from decisions of a planning and zoning commission, the Superior Court acts as an appellate body. See General Statutes § 8-8; see also *Par Developers, Ltd.* v. *Planning & Zoning Commission*, 37 Conn. App. 348, 353, 655 A.2d 1164 (1995) (noting zoning appeals in which Superior Court "reviewed the agency's decision in an appellate capacity").

[3] The western and southern portions of the defendant's property border the Quinnipiac River. As a result, the defendant filed corresponding coastal area management site plan applications with the commission. Those applications are not at issue in this appeal.

[4] Gray was the president of Eclipse Development Group, LLC, the developer of the defendant's property. The plaintiff's appeal to the Superior Court does not reference that entity in any manner. In its memorandum of decision, the court noted that "[t]he special permit was applied for by Eclipse Development Group, LLC, an entity related to [the defendant]. The parties to this case agreed at oral argument that Eclipse Development Group, LLC, is to be considered the same as [the defendant] for purposes of these appeals." For convenience, we likewise treat the defendant and Eclipse Development Group, LLC, as one and the same in this opinion.

"discussed the revised lighting, parking and coastal resource viewing areas. He also addressed the traffic study [submitted by the defendant]. Steve Ulman, traffic engineer with Purcell Associates, further discussed the traffic study with the commission. [Commission member James J.] Giulietti was concerned with the traffic impact in that area especially on the weekend. Mr. Ulman stated that on a Saturday afternoon there will be approximately 800 cars entering and 700 cars exiting from 1-2 p.m. There are 950 parking spaces. [Acting town engineer Andy] Bevilacqua further discussed having two left exit lanes, the flow of traffic through the main entrance; making one lane a right turn lane, and the public viewing area with the commission." The commission voted unanimously to approve the defendant's site plan later that evening. On November 13, 2007, the defendant presented a revised site plan to the commission, which also was unanimously approved by the commission.[5] No appeal was taken from those decisions by any party.

By letter dated March 4, 2008, the defendant wrote to North Haven First Selectwoman Janet McCarty "to formally express its desire to convey to the town of North Haven a portion of [its property] presently serving as a private drive." The defendant explained that "[d]uring our application process with the State Traffic Commission, it has become apparent that it would be mutually beneficial to dedicate this existing access drive for public highway purposes. It is our intent to convey this land at no cost to the town. . . . It is our

---

[5] With respect to the defendant's revised site plan, the minutes of the commission's November 13, 2007 meeting state: "[Gray] presented the applications. The proposed restaurant has been moved and will now have twenty-five feet of landscaping in front instead of being set back seventy-five feet. The development's sign has also been moved closer to the entrance. [Giulietti] is concerned about the traffic pattern near this restaurant." Giulietti nevertheless joined his colleagues on the commission in voting to approve the defendant's applications.

understanding that the access drive was constructed in accordance with town highway standards, which was verified by the town's engineering office."[6] On March 6, 2008, the Board of Selectmen approved a resolution confirming the town's interest in acquiring that access drive for use as a public road.

Approximately one month later, the defendant filed applications with the commission for a special permit under § 9.1.3.7.1 of the regulations and for site plan approval. The land use administrator for the town, Alan A. Fredricksen, thereafter submitted a written review of those applications. He stated in relevant part: "These applications are intended to permit [the defendant] to give to the town the existing access drive to [its] site and to the 'Target' shopping center located to its east. An offer to this effect was formally made by [the defendant] . . . . Our engineering office has verified that the driveway was constructed in accordance with town standard for a public road. A cul-de-sac is proposed by the [defendant] to permit turn around without the use of private property. . . . The special permit application . . . is in accordance with § 9.1.3.7.1 of the regulations and would permit the driveway to be given to the town, without altering the approved site plan with respect to building locations and setbacks. The site plan application . . . is required to reduce the size of the lot by giving the town the access driveway/public road. It is also required to add the cul-de-sac. . . ."

The defendant was required to obtain a special permit because the town's acceptance of the access road as a public road would transform the easterly portion of its property from a side yard to a front yard under the

---

[6] As noted in the written report prepared for the commission by the plaintiff's expert, Richard Pearson, the certificate of approval issued by the State Traffic Commission included a condition "that the existing private roadway become a public roadway . . . ."

regulations, creating a corner lot.[7] As a result, the minimum setback for the easterly portion of the property, which is located in a light industrial district, would increase from twenty-five to seventy-five feet. See North Haven Zoning Regs., art. V, § 5.1.2.

For that reason, the defendant sought a special permit pursuant to § 9.1.3.7.1 of the regulations. Article IX, § 9.1.3.7 of the North Haven Zoning Regulations provides: "Notwithstanding the definition of 'front yard' within these regulations as applied to corner lots, and notwithstanding the bulk requirements of each zoning district, in the case of a parcel or parcels found by the Planning and Zoning Commission to be unusually shaped or sized of land (or to be affected unusually by other requirements of these regulations) and located in whole or in part within a commercial and/or industrial district, the Commission may, in its discretion, after a public hearing and careful review and analysis of the proposed site plan, grant a special permit." Article IX, § 9.1.3.7.1 of the North Haven Zoning Regulations then provides that "[i]n the case of a corner lot, to modify the front yard setbacks so that one front yard may be reduced to no less than the side yard setback (or such lesser reduction as the Commission shall deem appropriate in the circumstances) . . . ." By reducing the setback on the easterly portion of the property to the applicable twenty-five foot side yard setback, the building locations previously approved by the commission would require no alteration whatsoever.

As noted by Fredricksen in his written report to the commission, the defendant's revised site plan application contained minor alterations from the site plan approved by the commission on November 13, 2007. First, it depicted the access road as a public road, thereby reducing the size of the defendant's property.

---

[7] The defendant's property borders Universal Drive to the north.

Second, it contained the cul-de-sac turnaround at the southern end of that public road. Third, it extended an existing concrete median at the northern side of the access road, which extension was required as a condition of approval by the State Traffic Commission. It is undisputed that the revised site plan contained no alteration to the location of buildings, driveways, or parking.

A properly noticed public hearing was held on June 2, 2008, at which time the defendant's representatives explained that the applications before the commission were triggered by the defendant's "offer to dedicate to the town" the access road. The plaintiff's representatives then spoke and raised two specific traffic concerns. The first pertained to the extension of the concrete median, which would prevent southbound traffic from entering the plaintiff's property at its northernmost entrance;[8] the second pertained to the lack of alignment between the proposed main entry to the defendant's property and a second entrance to the plaintiff's property.[9] Richard Pearson, a licensed professional engineer who had been retained by the plaintiff, articulated in greater detail the plaintiff's traffic concerns. Pearson acknowledged the traffic study submitted by the defendant as part of its prior applications before the commission, but nevertheless opined "that there should be further consideration of access alternatives, especially the alignment of their driveway opposite our driveway."

---

[8] Jerry Birmingham, Executive Vice President of National Realty and Development, spoke on behalf of the plaintiff. Birmingham opined that the extension of "that median closing off the driveway access to existing restaurants [at the northernmost entrance to the plaintiff's property] creates a loss of business with a clearly diminished access. . . . These [establishments on the plaintiff's property] are going to have a huge loss of business associated with it."

[9] The plaintiff's property contains three entrances from the access road.

Town attorney John Parese then spoke on behalf of McCarty. With respect to the extension of the median, Parese emphasized that it was the State Traffic Commission that insisted that the "median be extended in that direction . . . . I just want to clarify that this is not [the defendant] trying to gain an economic advantage . . . . That is a [State Traffic Commission] requirement which we tried to have waived. . . . [I]t is important for this commission to understand that this was not [the defendant's] proposal, it was the State Traffic Commission imposing that on the town."

In addition, Gray affirmed that the defendant "on a previous approval in front of this commission, agreed that should this intersection show a need to be regulated, be it a stop sign or a street light in the future, that we will bond for that potential need, and we would do that as desired by [town land use] staff or as dictated by the traffic patterns at that point in time . . . . So, should there be in the future . . . some need for some traffic regulation . . . we have agreed we could pay for it, we would install it, and we are actually leaving money in a bond to ensure that."[10]

Toward the end of the public hearing, John Vanacore, an alternate member of the commission, inquired as to whether there was "any concern about the offset driveway" proposed by the defendant. In response, Fredricksen stated that he was "happy to augment" the discussion in that regard. Fredricksen noted that he had attended the meeting with the State Traffic Commission, which "had a couple of concerns about that, and there was a great deal of additional information that was presented by the [defendant] to the [State

---

[10] Included in the record before us is an approved "bond estimate form" submitted by the defendant. After enumerating sixteen specific items and corresponding costs, that form specifies $75,000 for "other—signalization, [utility] poles."

Traffic Commission]. And in the end analysis, the conditioned letter that the [State Traffic Commission] provided answered all of those issues. The [State Traffic Commission] was happy with the plan, with all of the changes that the [defendant] is going to do. So, yes, when push came to shove, [the State Traffic Commission was] satisfied with the provisions that were being made [by the defendant]."

During its deliberations, the commission discussed the traffic concerns raised by the plaintiff. The following colloquy transpired between Chairman Dominic Palumbo and the town's land use administrators:

"[Palumbo]: [T]here was a concern . . . about the roadway brought up. What's your feeling on that, [Fredricksen] and [Bevilacqua]?

"[Fredricksen]: My feeling, having sat at the table at the [State Traffic Commission], was that the fight was not necessarily waged in this room or in this forum. When this commission approved [the defendant's prior site plan, the commission] approved it contingent on [State Traffic Commission] approval, which is just an intrinsic part of our regulations . . . . [The defendant] went to the [State Traffic Commission] and it was subject to a lot of review that included the authority having jurisdiction, the police department. I attended a meeting with the police department. Somehow, all the parties seemed to finally agree, and it was summarized in that final approval letter. . . . This was the final result of all that, so if—

"[Palumbo]: You mean the proposal that was made?

"[Fredricksen]: That's correct.

"[Palumbo]: As it was made?

"[Fredricksen]: Yes, and as it was approved. So if they want to go back to the [State Traffic Commission],

and if [the defendant] wants to go back . . . and inquire about getting rid of that [median extension], it seemed like there's some willingness to do that. But it seemed like [this commission is] not actually being asked to re-review, per se. . . .

"[Palumbo]: I don't know if we want to, anyway. What do you have to say about this, Andy?

"[Bevilacqua]: To me you've really got three issues here. You've got the extension on the [median]. To me, that's a [State Traffic Commission] thing. The [State Traffic Commission] decided that that was something that needed to be done here. I don't know why [this] commission would want to try to go against what the [State Traffic Commission] says. Certainly, if the [defendant] here wants to work with his neighbor and try to work to get that resolved, I think that's probably a good thing, but this is something that the [State Traffic Commission] has determined, based on their experience, that it's got to be divided.

"Regarding the driveways, I think that issue has been [vetted] through the prior approval process. Clearly the [State Traffic Commission] knew about it. Clearly the [State Traffic Commission] has looked at that. They had no comments. They had no conditions on their approval. So clearly they did not have any issues with that.

"And the third issue is the cul-de-sac. That's really where I focused my review, because to me that was really the first real new thing that we're talking about up here. I had a number of comments. I received a letter tonight from the [defendant] addressing the comments that I've put forth. I think they're all some things that can be worked out and provided in the proposal when it's revised. That's kind of my take on things.

"[Palumbo]: So, if I'm hearing correctly, [the town land use] staff feels that an approval, with your comments and your recommendations, are in order.

"[Fredricksen]: Yes, that's correct."

At that time, the commission voted unanimously to approve the defendant's special permit request and revised site plan.

The commission, through its secretary, Douglas Roberts, thereafter sent the defendant a certified letter of approval. That letter indicated that "at the regular monthly meeting of the [commission] held on Monday, June 2, 2008, the commission voted unanimously to approve [your] application" subject to certain enumerated conditions. The letter further stated that the commission's "decision was based upon the application and all supporting documents submitted; the testimony given at the [commission] meeting; the [regulations] and the plan of conservation and development for the town of North Haven, as well as the familiarity of the commission members with previous approvals for this development. . . ."

Apart from the defendant's applications for a special permit and site plan approval, the commission at its June 2, 2008 meeting reviewed an application from the town for a referral of the defendant's dedication of the access road pursuant to General Statutes § 8-24.[11] The meeting minutes reflect that the commission unanimously approved a motion "to send a positive referral for Section 8-24 referral for road acceptance . . . ."

---

[11] General Statutes § 8-24 provides in relevant part that "[n]o municipal agency or legislative body shall (1) locate, accept, abandon, widen, narrow or extend any street, bridge, parkway or other public way . . . until the proposal to take such action has been referred to the commission for a report." As this court has observed, "the commission referred to by . . . § 8-24 is the planning commission." *Trivalent Realty Co.* v. *Westport*, 2 Conn. App. 213, 215, 477 A.2d 140, cert. dismissed, 194 Conn. 807, 482 A.2d 712 (1984). In municipalities that have chosen to combine their planning and zoning commissions into one body; see General Statutes § 8-4a; that body acts in its planning capacity in reviewing an application filed pursuant to § 8-24. *Trivalent Realty Co.* v. *Westport*, supra, 215.

On June 19, 2008, the town convened a special town meeting on whether "to accept a town road on a portion of the property currently owned by [the defendant] at 240 Universal Drive North." The minutes of that meeting, which are part of the record before us, indicate that a resolution to accept that road was approved that evening.

The plaintiff subsequently commenced two appeals in the Superior Court challenging the decisions of the commission granting the special permit and approving the revised site plan, which were consolidated.[12] On January 19, 2010, the court issued its four-page memorandum of decision. In sustaining the plaintiff's appeals, the court reasoned as follows: "A review of the only traffic study which was entered into evidence before the [c]ommission indicated that the site plan approved by the [c]ommission would have a negative impact on plaintiff's property. In addition, the study indicates that it would result in significant traffic congestion. Furthermore, the implementation of the special permit will permanently block the existing northerly entrance to the plaintiff's property which will obviously interfere with the traffic flow to its shopping center. Finally, it will cause buildings existing on the property of the plaintiff that presently conform to the zoning regulations to become nonconforming. . . . Furthermore this will have a negative impact on the value of plaintiff's property." (Citations omitted; internal quotation marks omitted.) Accordingly, the court concluded that "[t]he plaintiff's appeal with respect to the special permit is hereby sustained. Because the site plan approval is dependent upon the upholding of the special permit,

---

[12] In docket number CV-08-4032208-S, the plaintiff challenged the propriety of the commission's decision to grant the special permit pursuant to § 9.1.3.7.1 of the regulations. In docket number CV-08-4032209-S, the plaintiff challenged the propriety of the commission's approval of the defendant's revised site plan.

the appeal with respect to the site plan must also be sustained."

The defendant filed motions for reargument and reconsideration, which the court denied. The defendant thereafter filed a petition for certification to appeal pursuant to General Statutes § 8-8 (o). We granted the defendant's petition and this appeal followed.

I

Preliminarily, we note that, at oral argument before this court, the parties stipulated that the median extension has been removed from the road since the Superior Court decided the appeals in early 2010. That stipulation renders moot a primary point of contention from these proceedings.

"Mootness presents a circumstance wherein the issue before the court has been resolved or had lost its significance because of a change in the condition of affairs between the parties. . . . A case becomes moot when due to intervening circumstances a controversy between the parties no longer exists. . . . An issue is moot when the court can no longer grant any practical relief. . . . [I]t is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow." (Citation omitted; internal quotation marks omitted.) *Berlin Batting Cages, Inc.* v. *Planning & Zoning Commission*, 76 Conn. App. 199, 204, 821 A.2d 269 (2003).

In sustaining the plaintiff's appeals, the court in its memorandum of decision specifically found that "the implementation of the special permit will permanently block the existing northerly entrance to the plaintiff's property which will obviously interfere with the traffic flow to its shopping center." The defendant in this appeal claims that this finding is erroneous. We need not pass on the propriety of the court's determination

in light of the parties' stipulation that the median extension has been removed. Suffice it to say that the parties to this appeal have conceded that the northerly entrance to the plaintiff's property no longer is blocked, nor is the traffic flow to the plaintiff's property from that entrance impaired, by the granting of the special permit. As a result, any issue regarding the median extension is now moot. We therefore dismiss that portion of the defendant's appeal.

## II

The principal question before us is whether the commission properly granted the defendant's request for a special permit under § 9.1.3.7.1 of the regulations. We answer that query in the affirmative.

## A

As a threshold matter, we note that the parties submit contrasting interpretations of § 9.1.3.7.1 of the regulations. The defendant contends that, unlike § 9.1.3.7.2 of the regulations, the plain language of § 9.1.3.7.1 does not require the commission to consider whether a given proposal presents "any significant adverse impact on traffic or nearby property values . . . ." See North Haven Zoning Regs., art. IX, § 9.1.3.7.2.[13] Accordingly,

---

[13] Article IX, § 9.1.3.7.2 of the North Haven Zoning Regulations provides that the commission may grant a special permit "[i]n the case of any such parcel of land, to modify any one or more of the bulk requirements by no more than 25% of the minimum or maximum allowed, as the case may be, where the Commission finds that the proposed modifications will increase the town's property tax base without any significant adverse impact on traffic or nearby property values or health, safety and welfare generally (greater than the effects anticipated by uses that could be made of the property without such modification[s]). In deciding whether to grant such special permit to modify any bulk requirement contained herein, the Commission shall give consideration to the specific use requested; the affect such use will have on present and future uses in the vicinity; the proposed site plan and landscaping in protecting and providing aesthetics to adjoining properties; and the conditions affecting traffic safety."

Article IX, § 9.1.3.7.1 of the North Haven Zoning Regulations provides that the commission may grant a special permit "[i]n the case of a corner lot, to modify the front yard setbacks so that one front yard may be reduced

the defendant posits that the court improperly considered those factors in reviewing the commission's decision to approve the special permit.[14] By contrast, the plaintiff argues that § 9.1.3.7.2 of the regulations, as well as the general provisions contained in both General Statutes § 8-2 and § 10.1.2.1 of the regulations, justified the court's consideration thereof.[15] We need not resolve

to no less than the side yard setback (or such lesser reduction as the Commission shall deem appropriate in the circumstances) . . . ."

[14] We employ a plenary standard of review over the Superior Court's interpretation of local land use regulations. See *Raymond* v. *Zoning Board of Appeals*, 76 Conn. App. 222, 229, 820 A.2d 275 ("[b]ecause the court, in interpreting the regulations, made conclusions of law . . . our review is plenary"), cert. denied, 264 Conn. 906, 826 A.2d 177 (2003). In the present case, the trial court stated in its memorandum of decision that the commission was authorized to grant the special permit sought pursuant to § 9.1.3.7.1 of the regulations "only if it does not have 'any significant adverse impact on traffic or nearby property values. . . .' [North Haven Zoning Regs., art. IX] § 9.1.3.7.2." In its brief before the Superior Court, the defendant specifically argued against such an interpretation and maintained that the only applicable criteria were those set forth in §§ 9.1.3.7 and 9.1.3.7.1 of the regulations.

[15] General Statutes § 8-2 (a) provides in relevant part: "All such regulations . . . may provide that certain classes or kinds of buildings, structures or uses of land are permitted only after obtaining a special permit or special exception from a zoning commission, planning commission, combined planning and zoning commission or zoning board of appeals, whichever commission or board the regulations may, notwithstanding any special act to the contrary, designate, subject to standards set forth in the regulations and to conditions necessary to protect the public health, safety, convenience and property values. Such regulations shall be made in accordance with a comprehensive plan and in adopting such regulations the commission shall consider the plan of conservation and development prepared under section 8-23. Such regulations shall be designed to lessen congestion in the streets; to secure safety from fire, panic, flood and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population and to facilitate the adequate provision for transportation, water, sewerage, schools, parks and other public requirements. Such regulations shall be made with reasonable consideration as to the character of the district and its peculiar suitability for particular uses and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality. . . ."

Article X, § 10.1.2 of the North Haven Zoning Regulations provides in relevant part: "The Planning and Zoning Commission shall not approve a duly submitted site plan unless it shall find that such plan conforms to the requirements of these Regulations. In reviewing the site plan, the Planning and Zoning Commission shall also take into consideration the public health,

that question of regulatory interpretation because we conclude that the commission's decision was proper under either standard.

Assuming arguendo that the court properly considered the impact on traffic and nearby property values, a review of the record before us contains ample support for the commission's decision. Significantly, the June 2, 2008 public hearing was not the commission's first encounter with the issue of traffic and property values related to the defendant's shopping center proposal. At its August 6, 2007 meeting, the defendant provided the commission with a traffic study as part of its site plan application. The defendant augmented that evidence with the testimony of Ulman, a traffic engineer, who responded to certain questions and concerns posed by commission members. Bevilacqua participated in that discussion as well, at the conclusion of which the commission unanimously approved the defendant's site plan. In so doing, the commission necessarily considered "the public health, safety and general welfare"; North Haven Zoning Regs., art. X, § 10.1.2; and necessarily concluded both that "traffic generated by the development will be properly handled both within the site and in relation to the adjoining street system"; North Haven Zoning Regs., art. X, § 10.1.2.1; and that the defendant's proposal had "the minimum potential adverse effect upon the established character or potential use of any adjoining properties." North Haven Zoning Regs., art. X, § 10.1.2.2. The commission heard further discussion of traffic concerns at its November 13, 2007 meeting, at which the commission again unanimously approved the defendant's revised site plan.

safety and general welfare, and shall set appropriate conditions and safeguards which are in harmony with the general purpose and intent of these regulations, particularly in regard to achieving the following:

"10.1.2.1 An adequate, convenient, and safe vehicular and pedestrian circulation system, so that traffic generated by the development will be properly handled both within the site and in relation to the adjoining street system. . . ."

In its certified letter of approval dated June 16, 2008, the commission stated that it predicated its June 2, 2008 decisions on the defendant's special permit and revised site plan applications on, inter alia, "the familiarity of the commission members with previous approvals for this development. . . ." The commission's reliance on its experience with the defendant's prior site plan hearings and the evidence submitted therein plainly was proper. As this court has observed, "commission members are entitled to rely on their expertise and judgment concerning matters within their knowledge, *particularly drawing on past experience for guidance.*" (Emphasis added.) *Jackson, Inc.* v. *Planning & Zoning Commission*, 118 Conn. App. 202, 210, 982 A.2d 1099 (2009), cert. denied, 294 Conn. 931, 986 A.2d 1056 (2010).

In addition, the record indicates that the State Traffic Commission approved the revised site plan that was before the commission in June of 2008. Particularly with respect to the lack of alignment between the proposed main entry to the defendant's property and the second entrance to the plaintiff's property, Fredricksen explained to the commission during the public hearing that the State Traffic Commission "was happy with [the defendant's] plan." We further note that the lack of alignment existed on the site plans approved in August and November of 2007; the revised site plan approved at the June 2, 2008 meeting did not alter that alignment in any manner.[16] For that reason, Bevilacqua opined during the commission's deliberations that the alignment "issue has been [vetted] through the prior approval process."

In addition, the record contains a report prepared by the North Haven police department on April 28, 2008,

[16] As the defendant emphasized in its appellate brief and at oral argument before this court, the plaintiff did not appeal from either the commission's August 6, 2007 or November 13, 2007 site plan approvals.

indicating that Chief James DiCarlo and Sergeant Robert DePalma had reviewed the defendant's revised site plan. That report stated that the police department "is in concurrence" with the assessment of the State Traffic Commission, which supported the revised plan. Town land use administrator Fredricksen and acting town engineer Bevilacqua likewise articulated their support of the defendant's applications to the commission.

Finally, it is well established that "lay members of commissions" are entitled to "rely on their personal knowledge concerning matters readily within their competence, such as traffic congestion and street safety . . . ." (Internal quotation marks omitted.) *Lee & Lamont Realty* v. *Planning & Zoning Commission*, 112 Conn. App. 484, 488, 963 A.2d 98 (2009). As our Supreme Court has recognized with respect to traffic concerns, a planning and zoning commission "may rely on . . . its own knowledge of these conditions." *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, 285 Conn. 381, 434, 941 A.2d 868 (2008). As residents of North Haven, the members of the commission undoubtedly possessed a familiarity with the property in question when it recently was the subject of two prior site plan applications and when a shopping center anchored by a Target store already operated on the plaintiff's abutting property. See *Timber Trails Associates* v. *Planning & Zoning Commission*, 99 Conn. App. 768, 783, 916 A.2d 99 (2007) (noting that court's review of questions of fact determined by planning and zoning commission "is based on the record, which includes the knowledge of the board members gained through personal observation of the site . . . or through their personal knowledge of the area involved" [internal quotation marks omitted]).

"A reviewing court may not substitute its own judgment for that of the commission. The question is not whether the trial court would have reached the same

conclusion, but whether the record before the [commission] supports the decision reached." (Internal quotation marks omitted.) *Clifford* v. *Planning & Zoning Commission*, 280 Conn. 434, 452, 908 A.2d 1049 (2006). In light of the aforementioned evidence, the commission reasonably could conclude that the defendant's proposal would not cause a significant adverse impact on traffic. The court's decision to the contrary is untenable in light of the totality of the record before us.

With respect to adverse impact on property values, the plaintiff's claim has two primary components. First, it argues that the median extension "resulted in the elimination of [its] northernmost entryway from incoming eastbound traffic. . . . [T]his would adversely affect its tenants' business and will have a correspondingly negative effect on rents to the plaintiff." That argument is unavailing in light of the parties' stipulation that the median extension has been removed.

The plaintiff also claims that the commission, in granting the special permit, created nonconformity on its property to the plaintiff's detriment. The court agreed, finding that "it will cause buildings existing on the property of the plaintiff that presently conform to the zoning regulations to become nonconforming. . . . [T]his will have a negative impact on the value of plaintiff's property." The defendant argues that the court's determination is misguided, as it was the municipality—and not the commission—that created said nonconformity through its acceptance of the public road. We agree with the defendant.

When the commission approved the defendant's special permit on June 2, 2008, the buildings on the plaintiff's property did not become nonconforming. That special permit merely modified the front yard setback on the easterly side of the defendant's property from

seventy-five to twenty-five feet. In the days that followed, the structures on the plaintiff's property continued to conform to the regulations. It was not until the town, through a duly noticed special town meeting, formally accepted the public road on June 19, 2008, that those structures became nonconforming, for the same reasons that necessitated the defendant's special permit request.

"From early times, under the common law, highways have been established in this state by dedication and acceptance by the public." (Internal quotation marks omitted.) *Ventres* v. *Farmington*, 192 Conn. 663, 666, 473 A.2d 1216 (1984). "General Statutes § 13a-48 provides for the formal acceptance of a highway by a municipality."[17] *Hamann* v. *Newtown*, 14 Conn. App. 521, 524, 541 A.2d 899 (1988).

"Acceptance of municipal highways under § 13a-48 . . . is an exercise of legislative discretion that may not be delegated." *Brookfield* v. *Greenridge, Inc.*, 177 Conn. 527, 533, 418 A.2d 907 (1979); see also *Reed* v. *Risley*, 151 Conn. 372, 377, 198 A.2d 55 (1964) (noting that "[t]he approval of a proposed street by the selectmen and its acceptance as a public street by the town are entirely separate and distinct proceedings"); E. Sostman & J. Anderson, "The Highway and the Right of Way: An Analysis of the Decisional Law in Connecticut Concerning Public, Private and Proposed Roads from Establishment to Abandonment," 61 Conn. B.J. 299, 303–304 (1987) ("[f]ormal acceptance [of a road] is done

---

[17] General Statutes § 13a-48 provides: "Any municipality whose duty it is to maintain the highways within its limits may, at any annual or special meeting held for that purpose, accept as a public highway any proposed highway situated in such municipality, provided any municipality in which a town meeting is the legislative body may by ordinance or resolution delegate the power to accept public highways to the board of selectmen in accordance with such procedures as the municipality may establish in the ordinance or resolution, and any municipality may, by charter, provide an alternative means for the acceptance of public highways."

at an annual or special meeting of the municipal governing body, with the approval of the planning commission, in accordance with [§§] 8-24 and 13a-48").

It is undisputed that, as in many Connecticut municipalities, the town meeting serves as the legislative body in the town. See Charter of the Town of North Haven, c. 9, § 901, available at http://www.town.north-haven.ct.us/documents/towncharter.pdf (last visited September 26, 2013); Connecticut State Register and Manual (2012), p. 406. That legislative function was exercised during the June 19, 2008 special town meeting, at which the town formally accepted the defendant's dedication of the public road.[18] Accordingly, the court's finding that the granting of the special permit caused buildings on the property of the plaintiff to become nonconforming is untenable.[19]

Because the commission's action in granting the special permit did not cause the buildings on the plaintiff's

---

[18] We note that more than five years have passed since the town accepted the public road, thereby creating the alleged nonconformity on the plaintiff's property. The record does not disclose whether the town instituted any action with respect to the buildings on the plaintiff's properties in the three years following that acceptance. If the town has not done so, the plaintiff's claim would be moot. General Statutes § 8-13a (a) provides in relevant part: "When a building is so situated on a lot that it violates a zoning regulation of a municipality which prescribes the location of such a building in relation to the boundaries of the lot . . . and when such building has been so situated for three years without the institution of an action to enforce such regulation, such building shall be deemed a nonconforming building in relation to such boundaries . . . ." As our Supreme Court has noted, "[a] lawfully established nonconforming use is a vested right and is entitled to constitutional protection." (Internal quotation marks omitted.) *Petruzzi* v. *Zoning Board of Appeals*, 176 Conn. 479, 484, 408 A.2d 243 (1979).

[19] Although the court did not make such a finding in its memorandum of decision, we note that the commission's act in granting a positive referral for acceptance of the defendant's dedication of the public road pursuant to § 8-24 cannot be said to create a nonconformity on the plaintiff's property. Under Connecticut law, such referrals are "purely advisory" and "not binding without further action by a municipal agency." *Fort Trumbull Conservancy, LLC* v. *Planning & Zoning Commission*, 266 Conn. 338, 359, 832 A.2d 611 (2003).

property to become nonconforming and because the parties concede that the northerly entrance to the plaintiff's property no longer is blocked by the median extension, the record does not support the conclusion that the defendant's proposal would cause a significant adverse impact on nearby property values. Accordingly, even if the court's consideration of the heightened criteria of § 9.1.3.7.2 of the regulations was proper, we nevertheless conclude that the record substantiates the commission's decision to grant the special permit in light of those factors.

B

We now turn our attention to the requirements expressly set forth in §§ 9.1.3.7 and 9.1.3.7.1 of the regulations. To be eligible for a special permit thereunder, the commission is required to find that the defendant's property (1) was either unusually shaped, unusually sized or affected unusually by other requirements of the regulations, (2) was located in whole or in part within a commercial and/or industrial district and (3) contained a corner lot. The commission also is required to hold a public hearing on such a special permit and to engage in a careful review and analysis of the proposed site plan.

"When ruling upon an application for a special permit, a planning and zoning board acts in an administrative capacity. . . . Generally, it is the function of a zoning board or commission to decide within prescribed limits and consistent with the exercise of [its] legal discretion, whether a particular section of the zoning regulations applies to a given situation and the manner in which it does apply. The [Appellate Court and] trial court [have] to decide whether the board correctly interpreted the section [of the regulations] and applied it with reasonable discretion to the facts. . . . In applying the law to the facts of a particular case, the board is endowed

with a liberal discretion, and its action is subject to review by the courts only to determine whether it was unreasonable, arbitrary or illegal." (Internal quotation marks omitted.) *A. Aiudi & Sons, LLC* v. *Planning & Zoning Commission*, 72 Conn. App. 502, 506, 806 A.2d 77 (2002), aff'd, 267 Conn. 192, 837 A.2d 748 (2004).

The detailed record before us, which includes numerous surveys, indicates that the defendant's 18.35 acre parcel is neither rectangular nor square; rather it vaguely resembles the shape of Montana, only backward. The property is bounded to the west and south by the Quinnipiac River, which necessitated the defendant's filing of coastal area management site plan applications with the commission. See footnote 3 of this opinion. A portion of the property also borders marshland to its west. In light of the foregoing, the commission reasonably could find that the defendant's property is unusual. At no time in these proceedings has the plaintiff argued otherwise. It also is undisputed that the defendant's property is located in an industrial district and, with the acceptance of the access strip as a public road by the town, is a corner lot.

On June 2, 2008, the commission held a public hearing on the defendant's special permit application to reduce the setback on the easterly side of its property from seventy-five to twenty-five feet. During its deliberations, the commission discussed the issues raised in that hearing with the town's land use administrator and acting town engineer, both of whom urged the commission to approve the application. Moreover, we note that the commission previously had reviewed and approved two similar site plan applications for the shopping center on the defendant's property within the past ten months. The members of the commission were entitled to rely on that experience in evaluating the revised site plan before them at the June 2, 2008 meeting. See *Jackson, Inc.* v. *Planning & Zoning Commission*, supra, 118

Conn. App. 210. We therefore conclude that the commission's exercise of its discretion to approve the defendant's application for a special permit under § 9.1.3.7.1 of the regulations was not unreasonable, arbitrary, or illegal.

### III

The court's memorandum of decision contains a substantive analysis of only the plaintiff's appeal in docket number CV-08-4032208-S challenging the propriety of the commission's decision to grant the special permit. After sustaining that appeal, the court stated that "[b]ecause the site plan approval is dependent upon the upholding of the special permit, the appeal with respect to the site plan must also be sustained." As a result, the court did not address the plaintiff's specific claims with respect to the commission's decision to approve the revised site plan. On remand, therefore, the court must consider those claims, mindful that "the review of site plan applications is an administrative function of a planning and zoning commission. . . . When a commission is functioning in such an administrative capacity, a reviewing court's standard of review of the commission's action is limited to whether it was illegal, arbitrary or in abuse of [its] discretion . . . ." (Citation omitted; internal quotation marks omitted.) *Gerlt* v. *Planning & Zoning Commission*, 290 Conn. 313, 322, 963 A.2d 31 (2009).

The portion of the defendant's appeal pertaining to the median extension is dismissed as moot. The judgment of the Superior Court is reversed with respect to the remainder of the defendant's appeal, and the case is remanded with direction to render judgment dismissing the plaintiff's appeal in docket number CV-08-4032208-S and for further proceedings consistent with this opinion in docket number CV-08-4032209-S.

In this opinion the other judges concurred.