******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## ST. JOSEPH'S HIGH SCHOOL, INC., ET AL.
## *v.* PLANNING AND ZONING COMMISSION
## OF THE TOWN OF TRUMBULL
## (AC 38816)

Lavine, Sheldon and Pellegrino, Js.

*Syllabus*

The plaintiffs appealed to the trial court from the decision of the defendant
planning and zoning commission denying their application for a special
permit to install lighting on certain real property on which the plaintiff
school was situated. The school sought a special permit, pursuant to
the applicable town zoning regulation (Article II, § 1.2.4.4), to authorize
the installation of four light poles, seventy feet in height, to illuminate
the school's primary athletic field. After the trial court granted the motion
to intervene filed by the defendant adjacent landowners, it rendered
judgment sustaining the appeal in part, concluding that the plaintiffs'
application met the technical requirements of § 1.2.4.4 (a) through (d)
of the zoning regulations, and that it satisfied each of the known and
definite standards therein. With respect to § 1.2.4.4 (e) of the regulations,
which provides that "[a]ll requirements of Article XV Special Permit/
Special Exception shall be satisfied," the court found that because Arti-
cle XV contained no definite standards with which a prospective appli-
cant must comply, it could not serve as the sole basis for denying a
special permit application when all of the known and definite standards
in the regulation in question have been satisfied. The court thus
remanded the matter to the commission with direction to approve the
special permit as requested, subject to such conditions that would be
necessary to protect the public health, safety, convenience and property
values. Subsequently, the intervening defendants, on the granting of
certification, appealed to this court. *Held*:

1. The trial court applied an improper legal standard in reviewing the commis-
sion's decision on the special permit application and determining that
the general standards contained in Article XV of the zoning regulations
could not serve as the sole basis for denying the special permit applica-
tion; a planning and zoning commission may deny a special permit
application on the basis of general standards set forth in the zoning
regulations, even when all technical requirements of the regulations
have been met, and, contrary to the plaintiffs' claim, this court's decision
in *MacKenzie* v. *Planning & Zoning Commission* (146 Conn. App. 406)
did not alter the ample body of appellate precedent regarding the ability
of a commission to append conditions to a special permit approval, or
its ability to predicate its decision on compliance with general standards
set forth in the zoning regulations.

2. The trial court improperly sustained the plaintiffs' appeal in part from
the commission's denial of their special permit application, as substantial
evidence existed in the record on which the commission, in its discretion,
could have relied in concluding that the school did not meet its burden
of demonstrating compliance with the general standards of Article XV
of the zoning regulations: on the basis of the testimony and evidence
in the record, the commission reasonably could have concluded, in its
discretion, that the school failed to demonstrate that the proposed use
would not adversely affect neighboring residential properties due to
nighttime noise emissions, in contravention of the regulations, that the
school's proposal lacked buffers that would adequately shield neigh-
boring residential properties from noise and light emissions, as required
by the regulations, and that the school did not establish that its proposed
use adequately avoided nonresidential traffic through residential streets,
that pedestrian and vehicular traffic to and from and in the vicinity of
the use would not be hazardous or inconvenient to, or detrimental to the
character of, the abutting residential neighborhood, that, with respect
to access and parking, the design of the proposed use adequately pro-
tected the residential character of surrounding residential neighbor-
hoods or residential zones, or that the proposed use would not

exacerbate special problems of police protection inherent in the proposed use; moreover, in exercising its discretion over whether the general standards of Article XV sufficiently were met, the commission could have concluded, on the record before it, that the school did not establish that the proposed use would not adversely affect neighboring property values, the character of the adjacent neighborhood, or the quality of life of its residents.

Argued April 25—officially released September 19, 2017

*Procedural History*

Appeal from the decision by the defendant denying the plaintiffs' application for a special permit to install certain lighting, brought to the Superior Court in the judicial district of Fairfield, where the court, *Bellis, J.*, granted the motion filed by Jeffrey W. Strouse et al. to intervene as defendants; thereafter, the matter was tried to the court, *Radcliffe, J.*; judgment sustaining the appeal in part, from which the defendant Jeffrey W. Strouse et al., on the granting of certification, appealed to this court. *Reversed; judgment directed.*

*Joel Z. Green*, with whom, on the brief, was *Linda Pesce Laske*, for the appellants (defendant Jeffrey W. Strouse et al.).

*Michael C. Jankovsky*, for the appellees (plaintiffs).

*Opinion*

SHELDON, J. The intervening defendants Jeffrey W. Strouse, Barbara M. Strouse, Mukesh H. Shah, Vibhavary M. Shah, Jai R. Singh, Sonali Singh, Dennis J. McEniry, and Joanne McEniry appeal from the judgment of the Superior Court sustaining in part the appeal of the plaintiffs, St. Joseph's High School, Inc. (school), and the Bridgeport Roman Catholic Diocesan Corp. (diocese), from the decision of the Planning and Zoning Commission of the Town of Trumbull (commission) denying the school's request for a special permit pursuant to Article II, § 1.2.4.4, of the Trumbull Zoning Regulations (regulations).[1] On appeal, the defendants contend that the court improperly concluded that the commission could not deny that request on the basis of noncompliance with general standards contained in the regulations. They further submit that substantial evidence in the record supports the commission's decision. We agree and, accordingly, reverse the judgment of the Superior Court.[2]

At all relevant times, the diocese owned a parcel of land located in the AA residential zone and known as 2320 Huntington Turnpike in Trumbull (property). For more than half a century, the school has operated a private secondary school on the property. Although currently 53.95 acres in size, the property originally was significantly larger. Approximately two decades ago, the diocese sold a sizeable portion of the property to developers, on which neighboring residential homes were constructed. The current owners of those adjacent properties are among those affected by the proposed special permit use at issue in this appeal.

Article II, § 1.2.4, of the regulations enumerates various special permit uses in the AA residential zone. Among such uses, as provided in § 1.2.4.4, are "[c]hurches and other places of worship, including parish houses and Sunday School buildings; non-profit primary and secondary schools; and buildings housing personnel affiliated with said churches and schools."

Pursuant to Article XVI, § 3, of the regulations, the commission is authorized "after public notice and a hearing, to amend, change, or repeal these Regulations . . . ." At the behest of the school, the commission, in August, 2014, exercised that authority by amending § 1.2.4.4 to permit the installation of lighting on athletic fields for nonprofit secondary schools.[3] Since it became effective on September 10, 2014, that amendment has provided, in relevant part: "Permanent and temporary light poles for lighted athletic fields on non-profit secondary school property shall be permitted for school related purposes only, provided: (a) The poles, lights and structures supporting such poles do not exceed a combined height of eighty (80) feet. (b) No such light structure shall be within two hundred (200) feet of an

abutting residential property line. (c) Applicant shall submit a photometric plan at the time of application. (d) Lights must be shut off no later than 11:00 p.m. and applicant shall install an automated control system to ensure compliance. (e) All requirements of Article XV Special Permit/Special Exception shall be satisfied."[4] The commission, in enacting that amendment, formally complied with all applicable procedural requirements. See General Statutes § 8-3; Trumbull Zoning Regs., art. XVI, § 3.

In accordance with § 1.2.4.4, as amended, the school filed an application for a special permit[5] to permit the installation of four light poles, seventy feet in height, to illuminate the school's primary athletic field. In that application, the school stated, in relevant part, that "[t]he fields and lights are well-buffered with mature landscaping and there will be no negative impact on the adjoining neighborhood."

On September 17, 2014, the commission held a public hearing on the application. Attorney Raymond Rizio appeared on behalf of the school and detailed how the proposal complied with the technical requirements of § 1.2.4.4. He first noted that the light poles would be ten feet shorter than the maximum height permitted under § 1.2.4.4 (a), and would be at least 325 feet away from abutting residential property lines, in compliance with § 1.2.4.4 (b). Rizio also stated that the abutting residential properties were "very well . . . buffered with heavily wooded property."

Consistent with § 1.2.4.4 (c), the school submitted a photometric plan to the commission. It also presented expert testimony on the impact of the proposed lighting by Mark Reynolds of Techline Sports Lighting, who indicated that, although there would be "some light spillage" around the athletic field, "when you get 100 feet away from that field, it's going to be pretty much down to nothing." Rizio similarly remarked that "the readings along the property lines basically measure zero, over 95 percent of the property line is zero or 0.1, which is one-tenth of a footcandle[6] at the property lines. And that's not taking into account . . . all of the . . . buffering that's up there with regard to the trees." (Footnote added.) The school's proposal also included the installation of an automated control system.

Rizio then noted certain general standards of Article XV that govern special permit applications, stating: "[W]e believe that we will have no impact on the neighborhood, we believe that we satisfy all of your special permit standards, that the use is appropriate. . . . We certainly are willing to put strong conditions on the application to ensure there is going to be minimal impact with regard to lights and activity on the property." Rizio also addressed the appropriateness of the proposed use, stating that "this is . . . a high school. [It] has athletic events. The athletic events need . . .

[lighting on] the field, during minimal times . . . . We believe there is adequate buffering and controls. . . . [W]e greatly exceed the required distances from residential properties. The property is already naturally buffered . . . . [A]ll the light will be directed. The distances are more than adequate. We have given you a photometric plan that shows there will be absolutely no impact, light impact, on the neighboring properties. So, appropriateness of the use, impact on neighboring properties, we believe is absolutely minimal."

After reminding the commission that it previously had approved the use of athletic fields on the property, Rizio submitted that the proposal presently before the commission was "a completely harmonious accessory use [that] complements the current use of the athletic fields." With respect to traffic considerations and the impact on residential properties, Rizio stated that "the intensity of the operations involved" with respect to "both pedestrian and vehicular traffic to and from the vicinity will not be hazardous. [There will be] no change in traffic plans."[7]

Rizio acknowledged that, in granting a special permit, the commission has the authority to place reasonable restrictions on the proposed use. See General Statutes § 8-2 (a) (special permits may be subject "to conditions necessary to protect the public health, safety, convenience and property values"); *Carpenter* v. *Planning & Zoning Commission*, 176 Conn. 581, 594, 409 A.2d 1029 (1979) (§ 8-2 "expressly" provides that "commissions [are] authorized to impose conditions as a prerequisite to certain uses of land"). He then articulated nine "voluntary conditions" that the school believed were appropriate restrictions on the special permit use in question.[8] Rizio concluded by noting that the school was proposing those conditions to "make sure we conform not only with the literal interpretation [of § 1.2.4.4], but [also] the spirit of the regulation."[9]

During the public comment portion of the hearing, the commission heard both support for and opposition to the school's proposal.[10] The commission also received written correspondence from seventeen additional members of the public, all of whom opposed the proposal. The common thread running through the comments of those who spoke in opposition was a fervent belief that permitting major sporting events on the property at nighttime would adversely affect property values, public safety, the residential character of their neighborhood, and the use and enjoyment of their properties.

When public comment concluded, the school responded to certain concerns raised therein. It volunteered two additional conditions of approval pertaining to its proposed special permit use. First, it agreed not to play any music when the proposed lights were utilized. Second, the school agreed that use of "the press box

and the public announcement [system] at [night] games would only occur during boys' varsity football and boys' varsity lacrosse . . . ." As to traffic concerns, Rizio noted that "there's no more games being added to the [property]. There's no more games at all being added to [the school]. It's the exact same games. And they are both held at nonpeak hours." He thus submitted that "[w]hether you have a Saturday football game or a Friday night football game, both games" would have the same impact on the neighborhood in terms of vehicular and pedestrian traffic. Arguing that the school had "satisfied all of the items required to achieve a special permit" under § 1.2.4.4, Rizio asked the commission to grant the application, subject to the conditions that the school had proposed.

The commission then closed the public hearing and began its deliberations on the school's application. Commissioner Fred Garrity spoke first, remarking that he was "hard-pressed to find things that the applicant did not do in this process or provide this evening." He also stated that "some of the neighbors will never be happy if lights go up. It doesn't matter what we would do. The parking is going to overflow on busy days. They will park in those neighborhoods on public streets, which has occurred over time . . . whether we put the lights up or not or allow it." Garrity thus opined that the school had met its obligations under § 1.2.4.4 and encouraged his colleagues to consider conditions of approval on its special permit application.

Commissioner Anthony Silber spoke next, reminding the commission that it had "voted for this text amendment unanimously." One commissioner later asked Attorney Vincent Marino, who was in attendance in his capacity as town attorney, about the commission's ability to consider the proposal's compliance with general standards set forth in the regulations, such as the detrimental effect on the quality of life of neighboring property owners. In response, Marino reminded commission members that, while amending § 1.2.4.4 "in August, one of the concerns that [was] raised is [whether] there were adequate protections through the special permit process to vote in the negative should the commission wish to vote in the negative because they did not want to find themselves in a position where, now that the regulation change was in place it was just going to be an automatic thing. And we had [an] extensive conversation on the special permit process and specifically Article XV and the protections that are afforded the special permit process through Article XV." To accommodate the concerns of neighboring property owners, Silber suggested adding a condition prohibiting night games on Saturdays as well as Sundays.

Commissioner David W. Preusch then opined that the central issue raised by the school's application was the impact of football games on the adjacent neighbor-

hood, stating: "I think what this boils [down to is] how do they handle parking? And where do they park? . . . [That] is the real problem here . . . . That we need to address. And to me, it's not a couple [of] soccer games, it's not a lacrosse game. . . . [W]hat this boils down to is football games. So, [the] focus [is] on five occurrences in the fall. . . . So, we have four to five occasions a year in the fall every other week or whatever is the home [football] game. . . . I'm just wondering if there is something we can do about these games. And the problems that or issues that have been brought up, which, to me, has everything to do with the parking." In response, Silber noted that the school had proposed several voluntary conditions "to try and mitigate" the impact of the proposed use. He continued: "[M]aybe there's some more that we could do there. . . . I am not sure what the right solution is, but I think for us it is about trying to find ways to protect the people who live on these streets and at the same time give the school the lights because I think it is the right thing to do."

Commissioner Richard C. Deecken then addressed the proposal, prefacing his remarks with the observation that "[t]his is a most difficult application . . . ." Deecken noted that "what we have here is, we are transferring the [load], we are transferring the intensity from one time to another, and if we all agree that intensity is no greater during a night game than it is during a day game, then we are in agreement. . . . But again, what I want to know and what I need to be convinced on is, is the load being transferred from day to night significant enough to warrant a negative vote?" Deecken also stated that, in his view, "the problem of light still remains" because, "as we know, you can see lights from a long distance,"[11] whether during games or nightly practices. Silber then proposed restricting lighting for practice sessions to 8 p.m. In response to concerns voiced by neighboring property owners, Silber also proposed a blanket prohibition against the use of the lights on weekends. A motion then was made to amend Garrity's original motion "to limit practices to 8 p.m. and eliminate weekend lights, flatly." That motion was unanimously approved.

Discussion then turned to the number of night football games that would be permitted each year. As Preusch noted, "the varsity football games are the issue. It's not the soccer . . . . It's not the lacrosse. It's the crowds. It's the football games." Silber responded that the school was not increasing the number of football games on the property, but simply "shifting the intensity" from day to night. Preusch then noted that "we are talking about the intensity of use here. And if we can cut the intensity of the expansion of use in half, that's what I am talking about. I am talking about a compromise." After further discussion, Deecken moved to amend the pending motion to limit the number of

varsity football games to a "[m]aximum of four games. Period." That motion was approved, with all commissioners but Garrity voting in favor.

At that time, Marino raised "a point of order." Marino reminded commission members that a prerequisite to the granting of a special permit was a specific finding by the commission pursuant to Article XV, § 4.14 (1), of the regulations,[12] as to the impact of the proposed use on surrounding residential neighborhoods. Marino further explained that "you have to incorporate that [finding] into your [primary] motion because it is required by your regulation. . . . If you vote negatively [on the primary motion] then it's a negative finding [and] if you vote affirmatively it's a positive finding" as to the impact on surrounding neighborhoods. In what the transcript suggests was a chaotic part of deliberations, commissioners expressed confusion as to the mechanics of implementing such a finding while at the same time discussing the merits thereof. At one point, Silber explained to his colleagues that Marino "is saying we have to say it explicitly. It's got to be part of the motion. . . . So, we are amending the motion to include that passage." When Anthony G. Chory, as chairman of the commission, ultimately called the question, he stated, "all in favor to amend the motion?" That motion to carried by a vote of three to two.[13]

Chory then called the motion to approve the school's special permit application, as amended several times. Silber and Garrity voted in favor of the motion, while Chory and Preusch voted against. Deecken abstained. As a result, the motion failed by virtue of the tie vote. The commission at that time articulated no reasons for that decision. See *Hall* v. *Planning & Zoning Board*, 153 Conn. 574, 576, 219 A.2d 445 (1966) ("[i]n such a case [as a tie vote] the board, as a body, [can] give no reason for its failure to act although the result [amounts] to a rejection of the application"). Rather, it immediately adjourned the meeting following the final vote. Both the legal notice subsequently published by the commission and the written notice sent to the school confirmed that the application had been "denied" by the commission.[14]

The plaintiffs filed a timely appeal of that decision with the Superior Court, arguing that the school's application fully complied with all applicable special permit requirements and that the commission's decision was not substantially supported by the record. The defendants filed a motion to intervene as statutorily aggrieved owners of abutting property, which the court granted. Although the plaintiffs and the defendants subsequently filed briefs on the substantive questions before the court, the commission did not do so. Rather, the commission filed a one sentence statement noting that it "takes no position in favor of the plaintiffs or the intervening defendants in this administrative appeal."

The court held a hearing on October 19, 2015, at which all counsel agreed that the school's special permit application satisfied the technical requirements of Article II, § 1.2.4.4 (a) through (d). Accordingly, the focus of the hearing was on compliance with § 1.2.4.4 (e), which provides that "[a]ll requirements of Article XV Special Permit/Special Exception shall be satisfied."

During the hearing, the court repeatedly asked counsel to identify the "known and fixed" and "clear and definite" standards contained in Article XV. In response, all counsel acknowledged that no such specificity was contained therein. Because Article II, § 1.2.4.4 (e), specifically provides that "[a]ll requirements of Article XV . . . shall be satisfied," the defendants' counsel nonetheless argued that the commission could predicate its decision on the general standards set forth in Article XV. The court, however, distinguished that last subsection of § 1.2.4.4 from its predecessors, stating that "[i]f there are general guidelines here [in Article XV], they can be the subject of health, safety and welfare conditions." The court later expounded on that distinction as follows: "An appeal could, I think, be sustained in part, to the extent [that the plaintiffs] comply with [the technical requirements of § 1.2.4.4 (a) through (d)] and [with respect to § 1.2.4.4 (e)] the commission [could be] told to impose conditions related to health, safety and welfare that are site specific and protect the health, safety, welfare and property values . . . ."

In its memorandum of decision, the court did precisely that. It noted that the record of the public hearing "unambiguously reveals that the applicant's proposal meets the [technical requirements] set forth in Article II, § 1.2.4.4, subparagraphs (a) through (d)." The court then turned its attention to Article XV of the regulations, the requirements of which must be satisfied pursuant to § 1.2.4.4 (e). It stated, in relevant part: "Article XV, § 4.14, deals with uses adjacent to or impacting residential areas. Although the section does not contain any specific standards or requirements, it does provide a guidepost for the commission, as it seeks to evaluate conditions which should be adopted, before a special permit application is approved. . . . A review of § 4.14 . . . demonstrates that certain 'findings' are required of the commission, when considering a special permit application which impacts a residential area. Because every special permit application is site specific, the nature and character of abutting properties must be considered when evaluating a specific proposal. Conditions imposed on a special permit may be designed to limit the impact on surrounding properties, and may be designed to preserve the residential character of a community. However, since Article XV, § 4.14,[15] contains no definite standards with which a prospective applicant must comply, it cannot serve as the sole basis for denying a special permit application, where all of

the known and definite standards in the regulation in question have been satisfied. To permit the denial of an application on the basis such as a finding that it is 'detrimental to the character of a residential district' is inconsistent with the administrative nature of the special permit review. When reviewing a special permit, a commission cannot act legislatively, or quasi-judicially. . . . Because the application submitted by the [school] satisfies each of the known and definite standards in the regulation, the plaintiffs' appeal must be sustained."[16] (Citations omitted; footnote added.)

The court thus sustained the plaintiffs' appeal in part, concluding that the commission should have granted the special permit due to the school's compliance with the technical requirements of § 1.2.4.4 (a) through (d). The court remanded the matter to the commission with direction "to approve the special permit as requested, subject to such conditions as are necessary to protect the public health, safety, convenience and property values." The defendants thereafter filed a petition for certification to appeal pursuant to General Statutes § 8-8 (o), which this court granted.[17]

Preliminarily, we note that "[t]he function of a special permit is to allow a property owner to use his property in a manner expressly permitted under the zoning regulations, subject to certain conditions necessary to protect the public health, safety, convenience, and surrounding property values." *Whisper Wind Development Corp.* v. *Planning & Zoning Commission*, 32 Conn. App. 515, 525, 630 A.2d 108 (1993) (*Dupont, C. J.*, dissenting), aff'd, 229 Conn. 176, 640 A.2d 100 (1994). "The basic rationale for the special permit [is] . . . that while certain [specially permitted] land uses may be generally compatible with the uses permitted as of right in particular zoning districts, their nature is such that their precise location and mode of operation must be regulated because of the topography, traffic problems, neighboring uses, etc., of the site. Common specially permitted uses, for example, are hospitals, churches and schools in residential zones. These uses are not as intrusive as commercial uses would be, yet they do generate parking and traffic problems that, if not properly planned for, might undermine the residential character of the neighborhood. If authorized only upon the granting of a special permit which may be issued after the [zoning commission] is satisfied that parking and traffic problems have been satisfactorily worked out, land usage in the community can be more flexibly arranged than if schools, churches and similar uses had to be allowed anywhere within a particular zoning district, or not at all." (Internal quotation marks omitted.) *Barberino Realty & Development Corp.* v. *Planning & Zoning Commission*, 222 Conn. 607, 612–13, 610 A.2d 1205 (1992). In reviewing a challenge to a "commission's administrative decision, we . . . must be mindful of the fact that the plaintiff, as the applicant,

bore the burden of persuading the commission that it was entitled to the permits that it sought" under the zoning regulations. (Internal quotation marks omitted.) *Loring* v. *Planning & Zoning Commission*, 287 Conn. 746, 778, 950 A.2d 494 (2008) (*Norcott, J.*, dissenting). With that context in mind, we turn our attention to the defendants' claims.

I

We first address the defendants' contention that the court applied an improper legal standard in reviewing the decision of the commission. That claim involves a question of law, over which our review is plenary. See *Total Recycling Services of Connecticut, Inc.* v. *Connecticut Oil Recycling Services, LLC*, 308 Conn. 312, 326, 63 A.3d 896 (2013).

There is no dispute that the school's special permit application complied with the technical requirements of Article II, § 1.2.4.4 (a) through (d). Accordingly, the only issue before the Superior Court was whether the commission properly could predicate its decision on compliance with general standards contained in Article XV of the regulations, as required by Article II, § 1.2.4.4 (e). The court answered that query in the negative, stating that those general standards "cannot serve as the sole basis for denying a special permit application . . . ." That determination, the defendants argue, constitutes a departure from established law.

Accordingly, our analysis begins with an overview of the pertinent land use jurisprudence of this state. More than one half century ago, our Supreme Court recognized that a zoning commission may deny a special permit on the basis of general standards regarding public health, safety, convenience and property values. In *Cameo Park Homes, Inc.* v. *Planning & Zoning Commission*, 150 Conn. 672, 675, 192 A.2d 886 (1963), the plaintiff filed an application to construct an apartment complex in a residential zone. Such construction was permitted under the applicable zoning regulations as a special permit use, which necessitated the approval of the defendant commission. Id., 674. Following a public hearing, the commission denied the plaintiff's application, finding, inter alia, that the proposed apartments "would affect the mode of living in the area by creating problems of safety for children"; that "the limitation of privacy due to the increase of traffic would tend to decrease the value of surrounding homes"; and "that the proposed use is not in harmony with the intent of the commission which wrote the regulations." Id., 676. On appeal, our Supreme Court upheld the propriety of the commission's decision, stating, in relevant part, that "[t]he commission's power to stipulate such restrictions as appear to it to be reasonable and the minimum necessary to protect property values in the district as a whole and the public health, safety and welfare, necessarily implies the power to withhold its approval of the pro-

posed use in its entirety if the commission finds that the circumstances warrant that action." (Internal quotation marks omitted.) Id., 676–77. Similarly, in *West Hartford Methodist Church* v. *Zoning Board of Appeals*, 143 Conn. 263, 269, 121 A.2d 640 (1956), the Supreme Court upheld the denial of a special permit based on a general standard requiring that the proposed activity "will not substantially or permanently injure the use of neighboring properties for residential purposes."

Despite—and arguably contrary to—that line of authority, our Supreme Court decades ago also indicated that "vague and undefined aesthetic considerations alone are insufficient to support the invocation of the police power, which is the source of all zoning authority." *DeMaria* v. *Planning & Zoning Commission*, 159 Conn. 534, 541, 271 A.2d 105 (1970); see also *Sonn* v. *Planning Commission*, 172 Conn. 156, 163, 374 A.2d 159 (1976) ("[t]he discretion of a commission must be controlled by fixed standards applied to all cases of a like nature"); *Powers* v. *Common Council*, 154 Conn. 156, 161, 222 A.2d 337 (1966) ("[a]lthough [§ 8-2] provides that the public health, safety, convenience and property values may be considered in making a determination on a special permit, this is to be done in conjunction with, and not as an alternative to, the standards which the zoning regulations themselves must provide").[18] *RK Development Corp.* v. *Norwalk*, 156 Conn. 369, 242 A.2d 781 (1968), is illustrative. In that case, the plaintiff sought approval of certain subdivision plans by the common council. In denying that request, the council indicated that it was concerned about "[t]he safety for the sake of the children as well as the people living up there; the welfare of the community and also the health hazards." (Internal quotation marks omitted.) Id., 376. On appeal, the Supreme Court held that the council's determination was improper, stating in relevant part: "The reason given by the council for its disapproval was vague, uncertain in meaning and provided no information to the plaintiff [as to how] the plan submitted failed to satisfy the requirements of the regulations. . . . The council cannot, in utter disregard of the regulations, disapprove the plan for a reason it would not be required to apply to all applications for planned residential developments as to which the same reason obtained. It would amount to substitution of the pure discretion of the council for a discretion controlled by fixed standards applying to all cases of a like nature." Id., 377.

Nevertheless, in a decision issued only six months later, our Supreme Court again rejected a challenge to a municipal land use agency's decision on a special permit application that was predicated on compliance with general standards. *Rocchi* v. *Zoning Board of Appeals*, 157 Conn. 106, 248 A.2d 922 (1968). In so doing, it noted that "a prerequisite to granting the [special permit was the determination] that the public welfare

and convenience would be substantially served and that the appropriate use of neighboring property would not be substantially or permanently injured. These criteria are sufficient to pass constitutional muster." Id., 113–14; accord *Barberino Realty & Development Corp.* v. *Planning & Zoning Commission*, supra, 222 Conn. 619 (rejecting claim that regulations requiring commission to "take 'adequate safeguards' for the protection of other properties and provide for 'adequate' traffic circulation and parking" were void for vagueness).

Whatever conflict previously existed in our land use jurisprudence on this issue was definitively resolved by our appellate courts in an appeal concerning a partially completed subdivision in Middlefield. In *Whisper Wind Development Corp.* v. *Planning & Zoning Commission*, supra, 32 Conn. App. 516–17, the plaintiff developer sought a special permit to excavate and remove sand and gravel from vacant subdivision parcels. In denying that request, the defendant commission stated that "[t]he proposed use would not be harmonious with the existing development in the district and would be detrimental to the orderly development of adjacent properties and that [t]he location, size, nature and intensity of the use would create a pedestrian and traffic hazard and would conflict with the traffic characteristics of the surrounding neighborhood." (Internal quotation marks omitted.) Id., 518. On appeal to this court, the plaintiff claimed that such general standards "do not provide an independent basis for denying special permit applications." Id., 519–20. Rather, the plaintiff argued that those general standards "may be used solely to place restrictions on an approved permit and may not be used as an alternative to the standards contained in the technical considerations section of the regulations . . . . [T]he plaintiff argues that once the specific requirements [of the applicable regulations] are met, the [special] permit must be granted, subject to any limitations that may be placed on that approval . . . . Thus, according to the plaintiff, [the general standards governing special permits] cannot serve as the sole basis for denying a special permit application, but can serve as the basis only for attaching conditions to the proposed plan." Id., 520. In short, the plaintiff's position in *Whisper Wind Development Corp.* was virtually identical to that articulated by the Superior Court in the present case.

This court disagreed with the plaintiff's contention. Noting cases such as *Cameo Park Homes, Inc.* v. *Planning & Zoning Commission*, supra, 150 Conn. 672, the court observed that "[o]n more than one occasion, our Supreme Court has held that standards set forth in the zoning regulations for the grant of a special permit may be general in nature." (Internal quotation marks omitted.) *Whisper Wind Development Corp.* v. *Planning & Zoning Commission*, supra, 32 Conn. App. 521–22. The court emphasized that "[i]t is well settled that

in granting a special permit, an applicant must satisf[y] all conditions imposed by the regulations." (Emphasis omitted; internal quotation marks omitted.) Id., 521. Because the regulations at issue contained both technical requirements and general standards, the court held that the failure to comply with *either* constituted a valid basis on which the commission could deny a special permit. As it stated, "the plaintiff's claim that the general health, safety and welfare requirements contained in the regulations must be considered only for the purpose of placing conditions on a special permit and may not be considered in determining whether to deny or grant the permit must fail." Id., 522.

Significantly, *Whisper Wind Development Corp.* included a dissenting opinion. Relying principally on *DeMaria* v. *Planning & Zoning Commission*, supra, 159 Conn. 541, the dissent submitted that "[a] special permit may be denied only for failure to meet specific standards in the regulations, and not for vague or general reasons." *Whisper Wind Development Corp.* v. *Planning & Zoning Commission*, supra, 32 Conn. App. 526 (*Dupont, C. J.*, dissenting). Because it was undisputed that the plaintiff had complied with all technical requirements of the regulations, the dissent stated that "[t]he commission could have imposed more stringent conditions, but I do not believe, given the language of the regulation and the nature of the use, that it could deny the permit altogether." Id., 527. The dissent also expressed concern that reliance on general standards could lead to arbitrary decisionmaking, stating that "[a] zoning authority should not be able to insulate a denial of a special permit from reversal by an appellate court simply by stating a subjective conclusion such as the use is not in harmony with existing development or that the use would be detrimental because of an increase in traffic congestion." Id., 529.

Our Supreme Court subsequently granted the *Whisper Wind Development Corp.* plaintiff's petition for certification to appeal. The certified question before the court was as follows: "Was the Appellate Court correct in concluding that the trial court properly determined that the plaintiff's failure to meet the general health, safety and welfare requirements set forth in the town's zoning regulations provided an adequate basis for the defendant's denial of a special permit application, even though the plaintiff's application complied with all of the technical requirements of the regulations applicable to special permits?" *Whisper Wind Development Corp.* v. *Planning & Zoning Commission*, 227 Conn. 929, 632 A.2d 706 (1993).

In a per curiam decision, a unanimous Supreme Court first noted that the Appellate Court majority had "agreed with the defendant's contention that, in the case of a special permit, zoning regulations may authorize a planning and zoning commission to deny an applica-

tion on the basis of enumerated general considerations such as public health, safety and welfare." *Whisper Wind Development Corp.* v. *Planning & Zoning Commission*, 229 Conn. 176, 177, 640 A.2d 100 (1994). It then concluded that "the judgment of the Appellate Court must be affirmed," stating that "[t]he issue on which we granted certification was properly resolved in the thoughtful and comprehensive majority opinion of the Appellate Court." Id.

Four years later, the Supreme Court expounded on the discretion of a commission with respect to such general standards. It stated: "We previously have recognized that the special permit process is, in fact, discretionary. In *Whisper Wind Development Corp.* v. *Planning & Zoning Commission*, [supra, 229 Conn. 177], we concluded that general considerations such as public health, safety and welfare, which are enumerated in zoning regulations, may be the basis for the denial of a special permit. Also, we have stated that before the zoning commission can determine whether the specially permitted use is compatible with the uses permitted as of right in the particular zoning district, it is required to judge whether any concerns, such as parking or traffic congestion, would adversely impact the surrounding neighborhood. . . . Connecticut courts have never held that a zoning commission lacks the ability to exercise discretion to determine whether the general standards in the regulations have been met in the special permit process. . . . If the special permit process were purely ministerial there would be no need to mandate a public hearing." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Irwin* v. *Planning & Zoning Commission*, 244 Conn. 619, 626–27, 711 A.2d 675 (1998). The court further noted that "[a]lthough it is true that the zoning commission does not have discretion to deny a special permit when the proposal meets the standards, it does have discretion to determine *whether* the proposal meets the standards set forth in the regulations. If, during the exercise of its discretion, the zoning commission decides that all of the standards enumerated in the special permit regulations are met, then it can no longer deny the application. The converse is, however, equally true. Thus, the zoning commission can exercise its discretion during the review of the proposed special [permit], as it applies the regulations to the specific application before it." (Emphasis in original.) Id., 628.

More recently, the Supreme Court has affirmed a commission's decision to deny a special permit on the basis of the general standard that "the proposed use was not in harmony with the general character of the neighborhood . . . ." *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, 285 Conn. 381, 436, 941 A.2d 868 (2008); accord *Meriden* v. *Planning & Zoning Commission*, 146 Conn. App. 240, 248–49, 77 A.3d 859 (2013) (upholding denial of

special permit on basis of general standard regarding intensification of use); *Children's School, Inc.* v. *Zoning Board of Appeals*, 66 Conn. App. 615, 626–31, 785 A.2d 607 (noting that board may "grant or deny applications for special [permits] based on . . . 'general' considerations" and concluding that substantial evidence supported a denial predicated thereon), cert. denied, 259 Conn. 903, 789 A.2d 990 (2001); *Connecticut Health Facilities, Inc.* v. *Zoning Board of Appeals*, 29 Conn. App. 1, 11, 613 A.2d 1358 (1992) (upholding denial of special permit on basis of general standards regarding public safety, traffic, and property values). There thus is no doubt that, under Connecticut law, a zoning commission may deny a special permit application on the basis of general standards set forth in the zoning regulations, even when all technical requirements of the regulations are met.

The plaintiffs nevertheless suggest that *MacKenzie* v. *Planning & Zoning Commission*, 146 Conn. App. 406, 77 A.3d 904 (2013), a recent decision of this court, altered the legal landscape with respect to such decisionmaking. For two distinct reasons, they are mistaken.

As a procedural matter, it is well established that this court, as an intermediate appellate tribunal, "is not at liberty to discard, modify, reconsider, reevaluate or overrule" the precedent of our Supreme Court. *Verrillo* v. *Zoning Board of Appeals*, 155 Conn. App. 657, 714, 111 A.3d 473 (2015). Furthermore, "it is axiomatic that one panel of [the Appellate Court] cannot overrule the precedent established by a previous panel's holding." (Internal quotation marks omitted.) *Samuel* v. *Hartford*, 154 Conn. App. 138, 144, 105 A.3d 333 (2014). As we often have stated, "this court's policy dictates that one panel should not, on its own, reverse the ruling of a previous panel. The reversal may be accomplished only if the appeal is heard en banc." (Internal quotation marks omitted.) *Boccanfuso* v. *Conner*, 89 Conn. App. 260, 285 n.20, 873 A.2d 208, cert. denied, 275 Conn. 905, 882 A.2d 668 (2005). The contention that *MacKenzie* overruled or otherwise modified an ample body of Supreme Court and Appellate Court precedent governing the denial of special permits on the basis of general standards necessarily assumes that the court contravened those fundamental principles of judicial restraint. We decline to make that assumption.

As a substantive matter, the plaintiffs' claim is untenable. *MacKenzie* involved a combined application that sought both a zone change and a special permit from the defendant commission. *MacKenzie* v. *Planning & Zoning Commission*, supra, 146 Conn. App. 409. The application was unique, in that with respect to the special permit request, the applicant presented the commission with two alternative proposals. The applicant's original plan would require the commission to " 'waive

or vary' " certain requirements set forth in the zoning regulations that plainly applied to the proposed use. Id., 412. The "alternate plan," by contrast, fully complied with "every standard that [was] set forth in the regulations." (Internal quotation marks omitted.) Id., 413. Following a public hearing, the commission granted the special permit in accordance with the applicant's original plan. In so doing, the commission waived certain setback and landscaping buffer requirements contained in the regulations that governed the proposal. Id., 411–19.

On appeal, the question addressed by this court was whether "the commission lacked the authority to vary those requirements." Id., 420. In answering that question, this court first reviewed relevant statutory and case law authority, concluding that "there is nothing contained within the General Statutes authorizing the commission to adopt regulations empowering itself to vary the application of the regulations when acting on a special [permit] request." Id., 428. The court further observed that "[t]he proposition that . . . the commission [properly may exercise] the power to vary the requirements of the [town's design business district] zone on a case-by-case basis reflects a fundamental misunderstanding of the role of the variance power within a municipality. The variance power exists to permit what is prohibited in a particular zone. . . . In simple terms, the zoning commission acts as a land use legislature in enacting zoning requirements. . . . By contrast, the zoning board of appeals is the court of equity of the zoning process . . . . [Z]oning commissions and zoning boards of appeal are, by design and by statute, independent branches of a municipality's land use department. Tellingly, the defendant has not presented this court with any precedent, nor have we discovered any, in which a zoning commission's decision to wield the variance power on a case-by-case basis within a given district has been upheld . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 428–30.

To be sure, *MacKenzie* also addressed the uniformity requirement of § 8-2.[19] Its discussion thereof must be considered in light of the bedrock precept that a zoning commission cannot grant a special permit unless the application satisfies *all* applicable requirements contained in the zoning regulations. See, e.g., *Heithaus* v. *Planning & Zoning Commission*, 258 Conn. 205, 215, 779 A.2d 750 (2001) (to obtain special permit, proposed use must satisfy standards set forth in zoning regulations); *Weigel* v. *Planning & Zoning Commission*, 160 Conn. 239, 246, 278 A.2d 766 (1971) ("[t]o justify the grant of the special permit, it must appear from the record before the commission that the manner in which the applicant proposes to use his property satisfies all conditions imposed by the regulations"); *Whisper Wind Development Corp.* v. *Planning & Zoning Commis-*

*sion*, supra, 32 Conn. App. 521 ("[i]t is well settled" that applicant must satisfy all conditions imposed by regulations to obtain special permit); R. Fuller, 9A Connecticut Practice Series: Land Use Law and Practice (4th Ed. 2015) § 33:4, p. 278 ("[f]or a special permit to be granted it must appear from the record before the agency that the application met all conditions imposed by the regulations"). *MacKenzie* did not alter that fundamental precept; in fact, it expressly adhered to it. See *MacKenzie* v. *Planning & Zoning Commission*, supra, 146 Conn. App. 438 (stating that "[t]o justify the grant of the special permit, it must appear from the record before the commission that the manner in which the applicant proposes to use his property satisfies all conditions imposed by the regulations" [internal quotation marks omitted]). *MacKenzie* ultimately held that when a special permit application fails to satisfy certain requirements imposed by the zoning regulations, a commission lacks authority to "vary or waive" those requirements. Id., 435.

*MacKenzie* further explained that the issue of a commission's ability to vary such requirements is fundamentally different from the issue of its authority to place greater restrictions on a special permit use through the imposition of conditions of approval, which originates in § 8-2.[20] Id., 434–35. The defendant in *MacKenzie* attempted to "turn this precept on its head, thereby granting a commission the power, in acting on such a special [permit] application, not only to impose greater restrictions on a parcel, but also to vary or waive existing restrictions—such as minimum setback and landscaped buffer requirements—applicable to all other properties within the district in contravention of the uniformity rule." Id., 435. This court declined to so rule. Id. Contrary to the plaintiffs' contention, *MacKenzie* did not alter the ample body of appellate authority regarding the ability of a commission to append conditions to a special permit approval, or its ability to predicate its decision on compliance with general standards set forth in the zoning regulations. Instead, it held that when a commission grants a special permit application that does not satisfy the applicable requirements of the zoning regulations, it "runs afoul of the uniformity requirement of [§] 8-2." Id., 431. For that reason, the plaintiffs' reliance on that precedent in the present case is unavailing.

Under Connecticut law, a zoning commission may deny a special permit application due to noncompliance with general standards contained in the zoning regulations. We, therefore, agree with the defendants that the court applied an improper legal standard in reviewing the commission's decision on the school's special permit application.

II

The question, then, is whether the record before us

supports a finding of noncompliance with the general standards of Article XV.[21] We agree with the defendants that substantial evidence exists in the record on which the commission, in its discretion, could have relied in concluding that the school did not meet its burden of demonstrating compliance therewith.

A

Legal Standard

At the outset, we note that special permits, "although expressly permitted by local regulations, must satisfy . . . standards set forth in the zoning regulations . . . . [I]f not properly planned for, [special permit uses] might undermine the residential character of the neighborhood. . . . [T]he goal of an application for a special [permit] is to seek permission to vary the use of a particular piece of property from that for which it is zoned, without offending the uses permitted as of right in the particular zoning district." (Internal quotation marks omitted.) *Municipal Funding, LLC* v. *Zoning Board of Appeals*, 270 Conn. 447, 453–54, 853 A.2d 511 (2004).

As our Supreme Court has emphasized, a zoning commission's decisionmaking on a special permit application involves the exercise of discretion. "Although it is true that the zoning commission does not have discretion to deny a special permit when the proposal meets the standards, it does have discretion to determine *whether* the proposal meets the standards set forth in the regulations. If, during the exercise of its discretion, the zoning commission decides that all of the standards enumerated in the special permit regulations are met, then it can no longer deny the application. The converse is, however, equally true. Thus, the zoning commission can exercise its discretion during the review of the proposed special [permit], as it applies the regulations to the specific application before it." (Emphasis in original.) *Irwin* v. *Planning & Zoning Commission*, supra, 244 Conn. 628. The exercise of that discretion "is inherently fact-specific, requiring an examination of the particular circumstances of the precise site for which the special permit is sought and the characteristics of the specific neighborhood in which the proposed [use] would [be made]." *Municipal Funding, LLC* v. *Zoning Board of Appeals*, supra, 270 Conn. 457.

Judicial review of zoning commission determinations is governed by the substantial evidence standard, under which "[c]onclusions reached by [the] commission must be upheld by the trial court if they are reasonably supported by the record. The credibility of the witnesses and the determination of issues of fact are matters solely within the province of the [commission]. . . . The question is not whether the trial court would have reached the same conclusion . . . but whether the record before the [commission] supports the deci-

sion reached. . . . If a trial court finds that there is substantial evidence to support a zoning board's findings, it cannot substitute its judgment for that of the board. . . . If there is conflicting evidence in support of the zoning commission's stated rationale, the reviewing court . . . cannot substitute its judgment as to the weight of the evidence for that of the commission. . . . The [commission's] decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given." (Internal quotation marks omitted.) *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, supra, 285 Conn. 427.

The substantial evidence standard is one that "is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review." (Internal quotation marks omitted.) *Sams* v. *Dept. of Environmental Protection*, 308 Conn. 359, 374, 63 A.3d 953 (2013); accord *Dickinson* v. *Zurko*, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L. Ed. 2d 143 (1999) (clearly erroneous standard stricter than substantial evidence standard); *Brunswick* v. *Statewide Grievance Committee*, 103 Conn. App. 601, 612, 931 A.2d 319 ("[t]he substantial evidence standard is even more deferential" than clearly erroneous standard), cert. denied, 284 Conn. 929, 934 A.2d 244 (2007). In that vein, our Supreme Court has described the substantial evidence standard as "an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action." (Internal quotation marks omitted.) *Property Group, Inc.* v. *Planning & Zoning Commission*, 226 Conn. 684, 697–98, 628 A.2d 1277 (1993).

In an appeal from a decision of a zoning commission, the "burden of overthrowing the decision . . . rest[s] squarely upon" the appellant. *Verney* v. *Planning & Zoning Board of Appeals*, 151 Conn. 578, 580, 200 A.2d 714 (1964); see also *Blaker* v. *Planning & Zoning Commission*, 212 Conn. 471, 478, 562 A.2d 1093 (1989) (party challenging action of zoning commission bears burden of proving that commission acted improperly). To meet its burden, an appellant "must establish that substantial evidence does not exist in the record as a whole to support the agency's decision." *Samperi* v. *Inland Wetlands Agency*, 226 Conn. 579, 587, 628 A.2d 1286 (1993).

Due to its tie vote, the commission did not state any collective reasons for its decision. In such instances, "we are obligated to search the entire record to ascertain whether the evidence reveals any proper basis for the [commission's] decision . . . ." *Verrillo* v. *Zoning Board of Appeals*, supra, 155 Conn. App. 676. As the Supreme Court has explained, a "reviewing court . . . must search the record of the hearings before [the]

commission to determine if there is an adequate basis for its decision. . . . [P]ublic policy reasons make it practical and fair to have a [reviewing] court on appeal search the record of a local land use body . . . composed of laymen whose procedural expertise may not always comply with the multitudinous statutory mandates under which they operate." (Citations omitted; internal quotation marks omitted.) *Samperi* v. *Inland Wetlands Agency*, supra, 226 Conn. 588–89.

The parties agree, and the record plainly indicates, that the technical requirements of Article II, § 1.2.4.4, of the regulations do not furnish a basis for denying the school's special permit application. Our task, then, is to review the record in search of substantial evidence to support a discretionary determination that the school had failed to meet its burden of establishing compliance with any of the general standards set forth in Article XV of the regulations.

B

Evidence in Record

1

Noise

We first consider the general standards regarding noise emissions. Article XV, § 4.12, sets forth various standards regarding the appropriateness of the proposed use. Among other things, it requires the applicant to demonstrate, and the commission to find, that the proposed special permit use "will not hinder or discourage the appropriate . . . use of adjacent land and buildings" and will not produce "the emission of noise . . . without adequate buffering or controls . . . ."

During the public comment portion of the public hearing, many neighboring property owners spoke in opposition to the school's proposal. A chief complaint concerned the issue of noise, with many speakers sharing their firsthand experiences with the commission.[22] Neighboring property owners also were concerned that noise from nighttime sporting events will make it difficult for their children or grandchildren to go to sleep. Several residents indicated that they were willing to tolerate the noise generated by major sporting events on the property during daytime hours. At the same time, they strongly opposed shifting those events to nighttime hours.[23]

With respect to the school's proposal to shift many of its major sporting events from daytime to nighttime, another abutting property owner, Jeffrey W. Strouse, submitted that the noise described previously by many of his neighbors "will unequivocally erase the peaceful environment and the natural surroundings that we invested in when we made the decision to live here. . . . It doesn't matter how tall these lights are . . . with the lights and the night games comes the noise

. . . ." Jeffrey W. Strouse implored the commission to remember that the matter before it pertained to the backyards of residential neighbors, stating: "[W]ho here among us would want that in her backyard? And when I say backyard, again, just to emphasize this. This is not over the hill, across the pond and past grandma's house. This is in my backyard."

In addition to that testimony during the public comment portion of the hearing, the commission received written letters from seventeen other neighboring residential property owners, all of whom expressed the concern that "nightly practices and football games at [the school] will lead to sound . . . pollution . . . and an overall deterioration of our quality of life . . . ."

During the rebuttal portion of the public hearing, Rizio proposed two additional conditions regarding "the noise issue." First, the school agreed to a condition prohibiting any music to be played "while the lights [are] on . . . ." Second, the school agreed to a restriction that "the press box and the public announcement [system] at [night] games would only occur during boys' varsity football and boys' varsity lacrosse . . . ." The question, then, becomes whether those additional conditions or others adequately addressed the noise problems detailed at length by neighboring property owners, sufficient to warrant a finding of compliance with § 4.12. Under Connecticut law, that determination is a matter left to the discretion of the commission. *Irwin* v. *Planning & Zoning Commission*, supra, 244 Conn. 628 (commission has discretion to determine whether proposal satisfies standards set forth in regulations). The task of balancing significant interests of purely local concern is one best decided by the local land use authority. As noted decades ago, "[t]he history of zoning legislation indicates a clear intent on the part of the General Assembly that, subject to certain underlying principles, the solution of zoning questions is for the local agencies." *Couch* v. *Zoning Commission*, 141 Conn. 349, 359, 106 A.2d 173 (1954); see also *Kutcher* v. *Town Planning Commission*, 138 Conn. 705, 709, 88 A.2d 538 (1952) (reviewing court "is powerless to replace the discretion of the commission with its own"). For that reason, "[i]t is well settled that a court, in reviewing the actions of [a zoning commission], is not permitted to substitute its judgment for that of the [commission] or to make factual determinations on its own." (Internal quotation marks omitted.) *R & R Pool & Patio, Inc.* v. *Zoning Board of Appeals*, 257 Conn. 456, 470, 778 A.2d 61 (2001).

On appeal, judicial review is confined to the question of whether the commission abused its discretion in finding that an applicant failed to demonstrate compliance with the requirements of applicable zoning regulations. When there is evidence in the record to substantiate the commission's determination, the deter-

mination must stand. See *Rural Water Co.* v. *Zoning Board of Appeals*, 287 Conn. 282, 294, 947 A.2d 944 (2008) (agency's decision must be sustained if examination of record discloses evidence that supports any reason given).

The record in the present case contains substantial evidence on which the commission could have relied in finding that the school failed to demonstrate that the proposed use would not adversely affect neighboring residential properties due to nighttime noise emissions, in contravention of § 4.12 of the regulations. We cannot say that the commission abused its discretion in denying the application on that basis.

2

Adequate Buffers

We next address the mandate of Article XV, § 5.4, of the regulations that applicants provide all-season visual buffers between the proposed use and adjacent residential properties. Section 4.12 similarly requires a showing that the proposed use will not produce "the emission of noise, light . . . or other offensive emissions without adequate buffering or controls . . . ."

At the September 17, 2014 public hearing, Rizio told the commission that the abutting residential properties were "very well . . . buffered with heavily wooded property." As multiple neighboring property owners noted during the public comment portion of that hearing, however, that wooded buffer is temporary in nature.[24] Jai R. Singh, another abutting property owner, also noted that "lights can be seen from a far distance. . . . [E]ven if your house is not bordering [the school], even if you live quite far away, you will see these lights every night."[25] Moreover, we already have recounted the testimony regarding the impact of noise emissions on neighboring property owners.[26]

On the basis of that testimonial and photographic evidence, the commission in its discretion reasonably could have concluded that the school's proposal lacked "all-season" buffers that would adequately contain noise and light emissions from neighboring residential properties, as required by §§ 4.12 and 5.4 of the regulations.

3

Special Problems Inherent in Proposed Use

Article XV contains a general standard regarding "special problems of . . . police protection inherent in the proposed use . . . ." Trumbull Zoning Regs., art. XV, § 4.12. "[T]he avoidance of non-residential traffic through residential streets" is another general standard set forth in § 4.12. Also relevant to this issue are the standards set forth in § 4.14 (1), which require the commission to find that the proposed use "shall be such that both pedestrian and vehicular traffic to and from

and in the vicinity of the use will not be hazardous or inconvenient to, or detrimental to the character of the said residential district or conflict with the traffic characteristics of the neighborhood. . . . Access, parking . . . shall be designed so as to protect the residential character of surrounding residential neighborhoods or residential zones."

At the public hearing, multiple residential property owners raised concerns about the detrimental impact that moving the school's major sporting events from daytime to nighttime would have on their neighborhood. The commission heard testimony from many members of the public detailing the parking and traffic issues that frequently arise when major sporting events such as football games are held on the property.[27]

Related to those traffic and parking concerns is the problem of loitering and disruptive behavior within the residential neighborhood, which transpires on a regular basis when major sporting events are held on the property. Multiple neighbors shared their personal experience with youths loitering in the neighborhood following such events at the school.[28] Another neighboring property owner told the commission that those parking, traffic, and loitering problems all present safety issues.[29] During his rebuttal on behalf of the school, Rizio acknowledged that "loitering is a police issue . . . ."

As our Supreme Court has explained, "before the zoning commission can determine whether the specially permitted use is compatible with the uses permitted as of right in the particular zoning district, it is required to judge whether any concerns, such as parking or traffic congestion, would adversely impact the surrounding neighborhood." *Barberino Realty & Development Corp.* v. *Planning & Zoning Commission*, supra, 222 Conn. 613. In light of the testimony elicited at the public hearing, the commission, in its discretion, reasonably could have concluded that the school had not established (1) that its proposed use adequately avoided nonresidential traffic through residential streets, as required by Article XV, § 4.12; (2) that nighttime pedestrian and vehicular traffic to and from and in the vicinity of the use "will not be hazardous or inconvenient to, or detrimental to the character" of the abutting residential neighborhood, as required by § 4.14; (3) that, with respect to access and parking, the design of the proposed use adequately protected the residential character of surrounding residential neighborhoods or residential zones, as required by § 4.14; and/or (4) that the proposed use would not exacerbate "special problems of . . . police protection inherent in the proposed use," as required by § 4.12.

4

Quality of Life, Character of Neighborhood
And Property Values

Article XV also contains several provisions related generally to the character of nearby residential neighborhoods and the quality of life therein. In setting forth standards as to the appropriateness of a proposed use on a given property, § 4.12 requires the commission to find, inter alia, that the proposed use "will not be detrimental to the orderly development of adjacent properties" and will preserve "the character of the neighborhood . . . ." Section 4.13 similarly requires the commission, in acting on a special permit application, to consider whether the design of the proposed use will adversely "impact the character or quality of life on adjoining properties, in the neighborhood . . . ." Section 4.14 (1), in turn, requires a finding by the commission as to whether "[a]ccess, parking . . . lighting . . . and landscaping [are] designed so as to protect the residential character of surrounding residential neighborhoods . . . ."

Article XV also requires the commission to make findings with respect to the impact of the proposed use on neighboring property values. Pursuant to § 4.12, the commission must find that the proposed use "will not hinder or discourage the appropriate development and use of adjacent land and buildings or impair the value thereof . . . ." Section 4.12 further requires the commission to evaluate "the overall impact on neighborhood property values . . . ." Section 4.13 likewise provides that the design of the proposed use "shall not be detrimental to property values in the neighborhood . . . ." Last, § 4.14 (3) requires the commission to find that the proposed use "will not hinder or discourage the appropriate . . . use of adjacent land . . . or impair the value thereof."

We have already detailed numerous issues raised by neighboring property owners at the public hearing regarding the impact of noise and light emissions, inadequate buffering, traffic, parking, and special problems inherent in the school's proposed use stemming from the influx of pedestrian and vehicular traffic in their neighborhood during major sporting events at the school. That evidence all bears directly on the quality of life, character of neighborhood, and property value standards contained in Article XV.

In addition, the commission heard testimony specifically addressing the character of the abutting residential neighborhood and the quality of life of its residents.[30] Helga Beloin, who stated that she lives across the street from the Shahs, explained to commission members how the proposed use would adversely affect the quality of life for nearby residents. She recounted her firsthand experience with noise emissions, parking problems, loitering, and disruptive behavior in the neighborhood on days when major sporting events are held at the school. Although she tolerated such activity during the daytime, she explained why allowing that activity at night would

harm her and other neighbors, stating that when the evening "rolls around, it's over. . . . [W]e're all getting ready for bed . . . it's quiet [and] we can do it . . . . We retired for the night, went to bed, started our new day, you know, refreshed from a good night's sleep. And now that's going to be impossible."

Adverse impact on property values was also a significant concern of abutting property owners.[31] During his rebuttal, Rizio stated that "there was no evidence at all put forth with regard to housing, depreciation of housing values." It nonetheless remained the burden of his client, as the applicant requesting a special permit, to demonstrate to the satisfaction of the commission that its application fully complied with the general standards contained in Article XV, including those concerning the impact on property values. *Loring* v. *Planning & Zoning Commission*, supra, 287 Conn. 778 (*Norcott, J.*, dissenting). During the public hearing, the school provided no evidence whatsoever on that issue, only Rizio's bald assertion that the proposed use "will have no impact on the neighborhood . . . ." Moreover, the commission heard ample testimony about the adverse impact that moving major sporting events at the school from daytime to nighttime would have on the adjacent residential area. In addition, several neighbors opined that the proposed use would detrimentally affect their property values, the character of their neighborhood, and their quality of life. The commission, as arbiter of credibility, was "entitled to credit the testimony and evidence adduced during the [public hearing] in arriving at its ultimate conclusion" as to compliance with the requirements of the regulations. *Children's School, Inc.* v. *Zoning Board of Appeals*, supra, 66 Conn. App. 630; see also *Hayes Family Ltd. Partnership* v. *Town Plan & Zoning Commission*, 115 Conn. App. 655, 662, 974 A.2d 61 (denial of special permit upheld when "evidence was presented that the plaintiffs' proposal would directly impact neighboring residential properties not only by way of increased noise and traffic, but also in that it would adversely affect their property values"), cert. denied, 293 Conn. 919, 979 A.2d 489 (2009). In exercising its discretion over whether the general standards of Article XV sufficiently were met, the commission could have concluded, on the record before it, that the school had not established that the proposed use would not adversely affect neighboring property values, the character of the adjacent neighborhood, or the quality of life of its residents.

C

Conclusion

Under the substantial evidence standard that governs challenges to commission determinations, the commission's decision "must be sustained if an examination of the record discloses evidence that supports any one of the reasons given." (Internal quotation marks omit-

ted.) *Rural Water Co.* v. *Zoning Board of Appeals*, supra, 287 Conn. 294. "The question is not whether [a reviewing court] would have reached the same conclusion but whether the record before the [commission] supports the decision reached." *Burnham* v. *Planning & Zoning Commission*, 189 Conn. 261, 265, 455 A.2d 339 (1983). A zoning commission has discretion to determine whether a proposal satisfies the requirements for a special permit; *Irwin* v. *Planning & Zoning Commission*, supra, 244 Conn. 628; and judicial review is confined to the question of whether the commission abused its discretion in finding that an applicant failed to demonstrate compliance therewith. In the present case, testimonial and documentary evidence exists in the record on which the commission could have found that the school did not demonstrate compliance with the general standards of Article XV in multiple respects. The Superior Court, therefore, improperly sustained the plaintiffs' appeal in part.

The judgment is reversed and the case is remanded with direction to dismiss the plaintiffs' appeal.

In this opinion the other judges concurred.

[1] Although the commission was named as a defendant in this action and participated in the proceeding below, it has not appealed from the judgment of the Superior Court. We therefore refer to the intervening defendants as the defendants in this opinion.

[2] "In hearing appeals from decisions of a planning and zoning commission, the Superior Court acts as an appellate body." *North Haven Holdings Ltd. Partnership* v. *Planning & Zoning Commission*, 146 Conn. App. 316, 319 n.2, 77 A.3d 866 (2013).

[3] It is undisputed that the plaintiffs have the only "non-profit secondary school property" in Trumbull to which that amendment could apply.

[4] Article XV, § 4, sets forth various "Criteria for Decision." To grant a special permit thereunder, the commission must find that the special permit application conforms "in *all respects* with these [r]egulations . . . ." (Emphasis added.) Trumbull Zoning Regs., art. XV, § 4.2.

[5] "[I]n the land use context, the terms 'special exception' and 'special permit' have 'the same meaning and can be used interchangeably.' *Beckish* v. *Planning & Zoning Commission*, 162 Conn. 11, 15, 291 A.2d 208 (1971)." *MacKenzie* v. *Planning & Zoning Commission*, 146 Conn. App. 406, 410 n.4, 77 A.3d 904 (2013). For purposes of clarity, we use the term "special permit" throughout this opinion.

[6] "A footcandle is a unit for measuring illumination and equals the amount of direct light thrown by a candle on a square foot of surface located 1 foot away." *State* v. *Hutch*, 30 Wn. App. 28, 30 n.1, 631 P.2d 1014, review denied, 96 Wn. 2d 1011 (1981).

[7] Apart from Rizio's comments to the commission, the school did not furnish any documentary or testimonial evidence on the impact of the proposed use with respect to vehicular and pedestrian traffic in neighboring residential areas.

[8] Rizio stated: "[O]ne would be, lights will only be used for [school] related events. . . . Two. The athletic field may not be rented to any outside vendors. . . . Three. The light system installed must contain automatic function that shuts the lights off. We will agree to a [shutoff time of] 10 p.m. for games, 9 p.m. for practices, Monday [through] Friday, [and] we would go to 8 p.m. on Saturday. There shall be no lights on Sunday. [Four.] The lights may only be used during the following times of the year: March 15 [through] June 15 and August 15 [through] December 15. . . . [Five.] [W]e . . . agree that the lights [shall] be dimmed to 50 percent of capacity for practice. [Six.] The approval shall only be for four light poles [to be located at] four very specific locations for one athletic field. . . . [Seven.] [T]he light system . . . may not be used to light any other field on the [school] campus. [Eight.] Light shields shall be installed on all light fixtures to ensure the same. . . . [Nine.] [W]e would agree that there would be no more than three games

per week in which the lights would be lit to a [full] game . . . light capacity."

[9] The commission also heard from the town planner, Jamie Bratt. Although she remarked that "the application does meet the special permit requirements . . . as was stated by the applicant," it is unclear whether she was referring to all special permit requirements or only the technical requirements of § 1.2.4.4. Bratt elaborated no further and did not discuss the general standards of Article XV in any manner.

[10] Six individuals spoke in support of the application, including two football coaches and one longtime faculty member at the school. Twelve members of the public spoke in opposition.

[11] During the public hearing, the commission received photographic evidence of illuminated lights at a nearby high school football field. Those photographs depicted the visibility of that lighting from various distances.

[12] Article XV, § 4.14 (1), of the regulations provides in relevant part: "The location and size of such [special permit] use, and the nature and intensity of operations involved in or conducted in connection therewith, shall be such that both pedestrian and vehicular traffic to and from and in the vicinity of the use will not be hazardous or inconvenient to, or detrimental to the character of the said residential district or conflict with the traffic characteristics of the neighborhood. . . . Access, parking, service areas, lighting, signs and landscaping shall be designed so as to protect the residential character of surrounding residential neighborhoods or residential zones."

[13] The plaintiffs claim that the commission at that time made an independent finding, in accordance with § 4.14 (1), that the school's proposed use would "not be hazardous or inconvenient to, or detrimental to the character of the said residential district or conflict with the traffic characteristics of the neighborhood . . . ." Having allegedly made such a finding, the plaintiffs maintain that the commission "could not legally deny the application," rendering the denial thereof "clearly arbitrary and illegal . . . ."

That claim was presented to, and rejected by, the Superior Court. In its memorandum of decision, the court found that Robert's Rules of Order governed the commission's proceedings. The court further found, pursuant to those rules, that the motion in question "carried the status of a subsidiary motion, which had the effect of amending the main motion. It was not a separate main motion." Following this court's granting of the defendants' petition for certification to appeal, the plaintiffs filed a cross appeal, in which they sought to raise the present issue. In response, the defendants moved to dismiss that cross appeal in light of the undisputed fact that "the plaintiffs did not file, and the Appellate Court did not grant, any petition or cross petition for certification." By order dated March 16, 2016, this court granted that motion and dismissed the plaintiffs' cross appeal. That issue, therefore, is not properly before this court.

[14] It is well established that "the failure of an application to garner enough votes for its approval amounts to a rejection of the application." *Merlo* v. *Planning & Zoning Commission*, 196 Conn. 676, 683, 495 A.2d 268 (1985). That precept applies equally to a tie vote among members of the land use agency. As our Supreme Court has explained, "[u]nder common law or parliamentary law, an affirmative resolution or action which is the subject of a tie vote fails of adoption." (Internal quotation marks omitted.) *Huck* v. *Inland Wetlands & Watercourses Agency*, 203 Conn. 525, 533 n.8, 525 A.2d 940 (1987); see also *Lupinacci* v. *Planning & Zoning Commission*, 153 Conn. 694, 696, 220 A.2d 274 (1966) (tie vote on zoning application "amounted to a denial"); *Smith-Groh, Inc.* v. *Planning & Zoning Commission*, 78 Conn. App. 216, 222–24, 826 A.2d 249 (2003) (rejecting claim that tie vote with one abstention did not constitute denial of special permit application). Consistent with that precedent, we construe the commission's decision on the school's application as a denial thereof.

[15] In responding to the plaintiffs' administrative appeal before the Superior Court, the defendants alleged that the commission properly could have predicated its decision on noncompliance with several sections of Article XV. Their July 16, 2015 brief to the court discussed § 4.11 ("Public Health and Safety"), § 4.12 ("Appropriateness of Use"), § 4.13 ("Architectural Character, Historic Preservation, Site Design"), § 4.14 ("Uses In, Adjacent to, or Impacting Residential Areas"), § 5.2 ("Lighting"), and § 5.4 ("Landscaping and Screening") of Article XV. In its memorandum of decision, however, the Superior Court focused exclusively on § 4.14.

[16] Because the court found that the general standards set forth in Article XV could not furnish a basis for denying a special permit application, it did not address the question of whether substantial evidence existed to support

the denial of the school's application thereunder.

[17] As it did in the proceeding before the Superior Court, the commission has taken no position on the merits of this appeal and has not filed an appellate brief.

[18] Notably, although *DeMaria* involves a special permit application; *DeMaria* v. *Planning & Zoning Commission*, supra, 159 Conn. 537; most cases in this line of authority do not. See, e.g., *Kosinski* v. *Lawlor*, 177 Conn. 420, 423, 418 A.2d 66 (1979) (site plan approval); *Sonn* v. *Planning Commission*, supra, 172 Conn. 157 (subdivision plan approval); *RK Development Corp.* v. *Norwalk*, supra, 156 Conn. 371 (application to common council for approval of residential development plan); *Powers* v. *Common Council*, supra, 154 Conn. 158 (application to common council for designation of property as multiple housing project area).

[19] General Statutes § 8-2 (a) provides, in relevant part: "The zoning commission of each city, town or borough is authorized to regulate, within the limits of such municipality, the height, number of stories and size of buildings and other structures; the percentage of the area of the lot that may be occupied; the size of yards, courts and other open spaces; the density of population and the location and use of buildings, structures and land for trade, industry, residence or other purposes. . . . All such regulations shall be uniform for each class or kind of buildings, structures or use of land throughout each district, but the regulations in one district may differ from those in another district . . . ."

[20] General Statutes § 8-2 (a) provides, in relevant part, that a commission may grant a special permit "subject to standards set forth in the regulations and to conditions necessary to protect the public health, safety, convenience and property values. . . ."

In *Summ* v. *Zoning Commission*, 150 Conn. 79, 86, 186 A.2d 160 (1962), our Supreme Court discussed the 1959 revision of § 8-2, noting that "the legislature added the provision authorizing the adoption by a zoning commission of regulations which would allow a use subject to standards set forth in the regulations and under special conditions, after the obtaining of a special permit. The power of local zoning authorities was thus broadened, and they were allowed to impose certain standards and conditions on the use of property when the public interest required it."

[21] We acknowledge that in the proceeding before it, the Superior Court did not address this question. Nevertheless, we are mindful that "[b]ecause [a zoning] appeal to the [Superior Court] is based solely on the record, the scope of the trial court's review of the [commission's] decision and the scope of our review of that decision are the same." (Internal quotation marks omitted.) *River Bend Associates, Inc.* v. *Zoning Commission*, 271 Conn. 1, 26–27 n.15, 856 A.2d 973 (2004). It would serve no useful purpose, therefore, to remand the matter to the Superior Court, particularly when the parties have briefed and argued the issue in this appeal.

[22] As but one example, Lawrence Ganum, who also lives near the school, stated that "we are talking quality of life, we are talking about a massive expansion of use, at night, of this facility. . . . [I]f you were in my yard or you were sitting outside having a cup of coffee with me, we'd be listening to hooting and hollering and screaming and the loud music and the loudspeakers." On the basis of his experience with daytime football games, Ganum stated that allowing such games at night would have "a massive impact on a very quiet, peaceful and comfortable [neighborhood]."

[23] For example, Helga Beloin, who stated that she lives across the street from the Shahs, informed the commission that the music currently played at sporting events on the property is so loud that "[i]t actually cuts down on [television] watching because [my children] can't watch [television] with the [noise] blaring at the school. . . . But we know that it comes [to] an end. Around 7-8 [p.m.] we know the activity at [the school] stops, so, you know it's okay. . . . We hear the noise. . . . But once again, 7:30 [p.m.] rolls around, it's over."

In their appellate brief, the plaintiffs describe the testimony of neighboring property owners during the public hearing as "speculative complaints . . . ." We disagree with that characterization. That testimony was predicated on firsthand experience with major sporting events held at the school, in some cases over the course of many years. As this court has observed, "the aim of the public hearing is to obtain any and all information relevant to the inquiry on hand, so as to facilitate the rendering of an informed decision by the board." *Komondy* v. *Zoning Board of Appeals*, 127 Conn. App. 669, 681, 16 A.3d 741 (2011). Testimony, such as Beloin's statement that the noise from school sporting events is so loud that her family cannot

hear the television inside their home, bears directly on the question of how the school's proposed use would impact the surrounding residential neighborhood. The commission alone is empowered to accept or reject such testimony. See *Children's School, Inc.* v. *Zoning Board of Appeals*, supra, 66 Conn. App. 630 (zoning board entitled to credit testimony offered at public hearing); *Pelliccione* v. *Planning & Zoning Commission*, 64 Conn. App. 320, 331, 780 A.2d 185 ("the commission, as the judge of credibility, is not required to believe any witness" [internal quotation marks omitted]), cert. denied, 258 Conn. 915, 782 A.2d 1245 (2001).

Furthermore, the commission, as the trier of fact in this municipal land use proceeding, was free to draw reasonable inferences from the testimonial and documentary evidence submitted during the public hearing. See, e.g., *Cockerham* v. *Zoning Board of Appeals*, 146 Conn. App. 355, 368, 77 A.3d 204 (2013) (municipal land use agency entitled to credit testimony at public hearing and draw reasonable inferences therefrom), cert. denied, 311 Conn. 919, 85 A.3d 653, 654 (2014); *Hayes Family Ltd. Partnership* v. *Town Plan & Zoning Commission*, 115 Conn. App. 655, 661, 974 A.2d 61 (evidence sufficient to sustain commission's finding "if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred" [internal quotation marks omitted]), cert. denied, 293 Conn. 919, 979 A.2d 489 (2009); *Raczkowski* v. *Zoning Commission*, 53 Conn. App. 636, 645, 733 A.2d 862 (upholding determination of zoning commission based on inference reasonably drawn from evidence in record), cert. denied, 250 Conn. 921, 738 A.2d 658 (1999). It often is said that jurors, in weighing the evidence, are not expected to leave their common sense at the courtroom door. *State* v. *Martinez*, 319 Conn. 712, 735, 127 A.3d 164 (2015). That precept applies equally to members of municipal land use agencies. See *Huck* v. *Inland Wetlands & Watercourses Agency*, supra, 203 Conn. 537 n.9 ("common sense maintains a proper place in a judicial or administrative proceeding").

On the ample testimony adduced at the public hearing on the noise issues experienced by neighboring property owners on a regular basis, the commission, as a matter of both reasonable inference and common sense, could in its discretion conclude that moving those sporting events from daytime to nighttime hours would have an adverse impact on the adjacent neighborhood and its residents.

[24] Jeffrey W. Strouse, whose property abuts the school's property, remarked, "[a]s autumn comes, the trees lose their leaves . . . . A buffer can only be as good as the leaves buffering the property. No leaves, no buffer. Guess what? The leaves [on these trees] are gone in the fall. . . . [T]here is no buffer there when the leaves fall . . . ." Joanne McEniry provided the commission with a photograph of her backyard, which borders the property. She explained that she did so to show the commission "[w]hat the buffer actually looks like for [six] months of the year. Which is pretty sparse. . . . Leaves actually do come off the trees in the fall."

[25] Jai R. Singh provided the commission with handouts that included photographs of a nearby high school football field illuminated at night. They included a photograph taken from a distance of approximately 700 feet, and another "about 1200 feet from the lights, which is basically [one quarter] of a mile." In those photographs, the lights are plainly visible. Lars Jorgenson, who also lives near the school, similarly remarked that "talking in these minute technicalities over [a footcandle] . . . really masks what [the proposed use] does to the neighbors of this property. And that is, if you look out the window, you are going to see those lights."

[26] In addition, multiple residents reminded the commission that, although the plaintiffs originally had a much larger parcel of land, they had made the tactical decision to sell a sizeable portion of it to developers, on which many homes are now located. As Joanne McEniry noted, the "school property is surrounded by our homes. Unfortunately, when the [diocese] decided to sell off a good chunk of their property to people who developed our homes, they did not have the foresight to envision these [proposed uses], their athletic program." Jeffrey W. Strouse, an abutting property owner whose family members had graduated from the school, stated: "I wish, I really wish, for [the school's] sake, that it would have been a different story for them. I wish that before the [diocese] had decided to sell off its land . . . [that] they would have first considered, how much space are we going to need one day? But for whatever reason, they sold more than they should. And what they are left with is a very limited space and a field that sits right on top of people's properties, with a buffer that's only good in the summer when these lights won't even be on anyway."

[27] As Michael Love, who also lives near the school, told the commission,

"I can tell you right now, when there's a big [school] event, parking overflows into our neighborhood. People park there intentionally because there is only one exit to get out of [the school], so they can walk over to their car, they can go away much faster than people exiting the parking lots, which probably aren't big enough in the first place. Parking is really the result also of all of the traffic that is going to be there. More people are going to come to these games. It's going to increase traffic in our neighborhood. I can tell you right now, people zipping through our winding roads don't obey the speed limits and they don't obey the stop signs. It's terrible what they do to our neighborhoods."

In his initial presentation, Rizio acknowledged that one impetus for the school's proposal was to enable more people to attend sporting events on the property. Joe Dzurenda, a school employee, also confirmed that "a football game where we have an abundance [of attendees] . . . does create excessive traffic . . . ."

[28] Helga Beloin, who stated that she lives across the street from the Shahs, shared with the commission her firsthand knowledge of "the activity that goes on at the end of the cul-de-sac" on her street, which abuts the school's property. She explained that "kids are kids, they get together at the end of the cul-de-sac, make a party. . . . [W]ith more nighttime games, it will promote more of this partying atmosphere. And you will have more kids hanging out at the corner or on the cul-de-sac. We've woken up to garbage, broken glass, empty beer cans, garbage in the cul-de-sac that, on occasion we have had to pick up; at various times, we have taken turns, the neighbors who have had to pick up. And we do it. I haven't called the police like other people have because it didn't happen so often that I felt like I needed to. But I'm afraid with the lights on a Friday night or Saturday night, [I] will. There's also a lot of traffic with the kids, you know, hanging out longer on the corner, with their blaring music. They will park there and will talk and they laugh and so forth and so on."

Vibhavary M. Shah told the commission that "so many kids [already] hang out on the cul-de-sac" during major sporting events that, on multiple occasions, she has been forced to call "the cops to get rid of those kids . . . ."

In his remarks, Jeffrey W. Strouse noted that he "met recently one of my neighbors who . . . is an older woman, and her house sits just near the field. She echoed a lot of the same things you heard tonight about the noise and the woods and the loitering. She finds herself . . . actually going out to clean up their cans the morning after. I can only imagine how much more time she will be spending cleaning out her beautiful woods after these nighttime games."

[29] As Karen Draper, a neighbor of the Shahs, stated, "I'm concerned about the proposal . . . . I'm concerned for the safety of my children. I have [three] children, [ages nine, seven, and three]. This will affect the enjoyment of my property, it will increase the amount of loitering at the end of [the street] . . . and will add a considerable amount of traffic. The traffic does not stop, nor do the students abide by the . . . stop signs and speed limits. This [proposal] places an unnecessary burden on my neighborhood . . . ."

[30] As Lawrence Ganum, who also lives near the school, told commission members, his family "moved here for a reason, for a certain quality of life," and, after noting the problems of noise emissions and loitering in his neighborhood, stated that the proposed use would have "a massive impact on a very quiet, peaceful and comfortable neighborhood."

Karen Draper, a neighbor of the Shahs, testified that the proposed use "will affect the enjoyment of my property, it will increase the amount of loitering at the end of [her street], and will add a considerable amount of traffic." Jeffrey W. Strouse stated that he and his neighbors were "just trying to protect the value of our land and the quality of our lives." Alluding to the various conditions of approval proposed by the school, Robert Haymond, another resident, stated: "I'd just like to ask, why limit the days of the week? Why turn down the lights? Why agree to turn them off early?" Haymond then answered his own question: "[T]he reason is, because they affect the community."

[31] In his remarks, another resident who lives near the school, whom the record identifies only as S. Edelman, opined that the proposed use would cause "major housing depreciation . . . . [There are] about [six to seven] houses; they are exposed to [the school]. Those [six to seven] houses, they also have neighbors, they have houses across the street. You bring the price of one house down, exponentially, the whole neighborhood will go down. People, when they [consider purchasing a home] nowadays, they look at

what's the house [values] on each of the lanes. They don't pay attention that this house has a flaw in terms of being exposed, they look at that one price and the whole neighborhood will come down." On a similar note, Jeffrey W. Strouse reminded the commission that a principal purpose of the regulations, memorialized in the preamble thereto, was "to preserve and protect" property values. Trumbull Zoning Regs., art. I, § 1. In his view, the school's application was likely to damage the value of neighboring residential properties.

---